# 22-3210

## United States Court of Appeals
## for the Second Circuit

JONATHAN CORBETT,

*Plaintiff-Appellant,*

v.

KATHLEEN HOCHUL, in her official capacity as chief executive of the State of New York, LETITIA JAMES, in her official capacity as Attorney General of the State of New York, ERIC ADAMS, in his official capacity as Mayor of the City of New York, KEECHANT SEWELL, in her official capacity as Police Commissioner of the New York Police Department, INSPECTOR HUGH BOGLE, in his official capacity as Commanding Officer of the New York Police Department, Licensing Division, KEVIN BRUEN, in his official capacity as Superintendent of the New York State Police,

*Defendants-Appellees.*

On Appeal from the United States District Court
for the Southern District of New York

## BRIEF FOR STATE APPELLEES

BARBARA D. UNDERWOOD
  *Solicitor General*
JUDITH N. VALE
  *Deputy Solicitor General*
PHILIP J. LEVITZ
  *Assistant Solicitor General*
    *of Counsel*

LETITIA JAMES
  *Attorney General*
  *State of New York*
Attorney for State Appellees
28 Liberty Street
New York, New York 10005
(212) 416-6325

Dated: June 13, 2023

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ..................................................................iii

PRELIMINARY STATEMENT ........................................................ 1

ISSUE PRESENTED ........................................................................ 3

STATEMENT OF THE CASE ......................................................... 4

    A.   Legal Background .................................................................. 4

        1.   The U.S. Supreme Court's decision in *New York State Rifle & Pistol Association v. Bruen* .......................... 4

        2.   New York's Concealed Carry Improvement Act .............. 7

    B.   Procedural Background .......................................................... 9

        1.   Corbett's lawsuit and motion for a preliminary injunction ..................................................................... 9

        2.   The district court's denial of Corbett's preliminary injunction motion ........................................................ 10

STANDARD OF REVIEW ............................................................ 12

SUMMARY OF ARGUMENT ...................................................... 13

ARGUMENT .................................................................................. 17

POINT I

CORBETT IS EXCEEDINGLY UNLIKELY TO SUCCEED ON THE MERITS OF HIS SECOND AMENDMENT CLAIM AGAINST THE STATE DEFENDANTS ............................................................................ 17

    A.   The Training Requirement Is Consistent with the Second Amendment. .......................................................... 17

i

**Page**

       1.    The Second Amendment's text does not protect carrying firearms without any training. ......................... 17

       2.    In any event, the training requirement is consistent with history and tradition. ............................................... 21

  B.    Alternatively, Corbett Lacks Standing to Pursue His Claim Against the State Defendants. ..................................... 30

       1.    Corbett's alleged injury would not be traceable to, or redressable by, the state defendants........................... 31

       2.    Corbett has not suffered a concrete injury in fact. ......... 33

POINT II

  THE PUBLIC INTEREST AND BALANCE OF THE EQUITIES ALSO WEIGH STRONGLY AGAINST A PRELIMINARY INJUNCTION ....................... 34

CONCLUSION ...................................................................................... 38

# TABLE OF AUTHORITIES

**Cases** Page(s)

*Antonyuk v. Hochul,*
No. 22-cv-0986, 2022 WL 16744700 (N.D.N.Y. Nov. 7, 2022).......25-26

*Citigroup Glob. Mkts., Inc. v. VCG Special Opportunities*
*Master Fund Ltd.,*
598 F.3d 30 (2d Cir. 2010) ................................................... 13

*Connecticut State Police Union v. Rovella,*
36 F.4th 54 (2d Cir.)........................................................ 13

*District of Columbia v. Heller,*
554 U.S. 570 (2008)........................................................ 18

*In re Dairy Mart Convenience Stores, Inc.,*
411 F.3d 367 (2d Cir. 2005) ............................................... 33

*Kane v. De Blasio,*
19 F.4th 152 (2d Cir. 2021)................................................ 36

*Libertarian Party of Erie Cnty. v. Cuomo,*
970 F.3d 106 (2d Cir. 2020) ........................................16, 32-34

*Maryland v. King,*
567 U.S. 1301 (2012) ...................................................... 35

*New York ex rel. Schneiderman v. Actavis PLC,*
787 F.3d 638 (2d Cir. 2015) ...........................................13, 37

*New York State Rifle & Pistol Ass'n v. Bruen,*
142 S. Ct. 2111 (2022)................................................. passim

*Parker v. District of Columbia,*
478 F.3d 370 (D.C. Cir. 2007).............................................. 33

*Romer v. Green Point Sav. Bank,*
27 F.3d 12 (2d Cir. 1994) .................................................. 36

**Cases**                                                              **Page(s)**

*Spokeo, Inc. v. Robins*,
    578 U.S. 330 (2016) ................................................................ 30

*Uniformed Fire Officers Ass'n v. De Blasio*,
    973 F.3d 41 (2d Cir. 2020) .................................................... 35

*Weight Watchers Int'l, Inc. v. Luigino's, Inc.*,
    423 F.3d 137 (2d Cir. 2005) .................................................. 37

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008) ............................................................. 12-13

## Constitution

U.S. Const. amend. II ....................................................... 18-19

## Laws & Regulations

*Federal*

Militia Act of 1792, ch. 33, 1 Stat. 271 ................................. 22, 24, 27-28

*New York*

Ch. 371, 2022 N.Y. Laws (N.Y. Legis. Retrieval Sys.) ......................... 7-8

Penal Law
    § 265.00 ........................................................................ 31
    § 265.03 ........................................................................ 4
    § 265.20 ........................................................................ 4
    § 400.00 ................................................................. 4, 8, 29, 31-32

*States (alphabetical)*

Alaska Admin. Code tit. 13, § 30.070 ....................................... 21

Alaska Stat. § 18.65.715 ................................................... 20-21

Ariz. Rev. Stat. § 13-3112 ................................................. 20

## Laws & Regulations

*States*

Ark. Code Ann. 5-73-309 .......................................................................... 20

Cal. Penal Code
  § 26150 ................................................................................................ 20
  § 26165 ................................................................................................ 20

Colo. Rev. Stat. § 18-12-203 .................................................................... 20

Conn. Gen. Stat. § 29-28 ........................................................................... 20

D.C. Code § 7-2509.02 ........................................................................ 20-21

Del. Code Ann. tit. 11, § 1441 ................................................................. 20

Fla. Stat. § 790.06 ...................................................................................... 20

Act of Nov. 15, 1778, 19 *The Colonial Records of the State of Georgia*, pt. 2 (Allen D. Candler, comp., 1911) ................................... 24

Act of Feb. 26, 1784, 19 *The Colonial Records of the State of Georgia*, pt. 2 (Allen D. Candler, comp., 1911) ................................... 23

Haw. Rev. Stat. Ann. § 134-2 ................................................................. 20

Idaho Code § 18-3302 ............................................................................... 20

430 Ill. Comp. Stat. 66/75 .................................................................. 20-21

Iowa Code § 724.9 ...................................................................................... 20

Kan. Stat. Ann. § 75-7c04 ....................................................................... 20

Ky. Rev. Stat. Ann. 237.110 ..................................................................... 20

La. Rev. Stat. § 40:1379.3 ......................................................................... 20

Me. Rev. Stat. Ann. tit. 25, § 2003 ......................................................... 20

Md. Code Ann., Pub. Safety § 5-306 .................................................. 20-21

v

## Laws & Regulations

*States*

Mass. Gen. Laws ch. 140, § 131P ........................................................... 20

Mich. Comp. Laws § 28.425b ................................................................. 20

Minn. Stat. § 624.714 ........................................................................... 20

Mo. Rev. Stat. § 571.111 ....................................................................... 20

Mont. Code Ann. § 45-8-321 ................................................................. 20

Neb. Rev. Stat.
  § 69-2432 ......................................................................................... 20
  § 69-2433 ......................................................................................... 20

Nev. Rev. Stat. § 202.3657 .................................................................... 20

1792 N.H. Laws 446 ............................................................................. 24

N.J. Admin. Code § 13:54-2.4 ............................................................... 20

N.M. Stat. Ann. § 29-19-7 ................................................................. 20-21

N.C. Gen. Stat. § 14-415.12 .................................................................. 20

N.D. Cent. Code § 62.1-04-03 ............................................................... 20

Ohio Rev. Code Ann. § 2923.125 .......................................................... 20

Okla. Stat. tit. 21, § 1290.12 ................................................................. 20

Or. Rev. Stat. § 166.291 ........................................................................ 20

11 R.I. Gen. Laws § 11-47-15 ................................................................ 20

S.C. Code Ann. § 23-31-215 .................................................................. 20

Tenn. Code Ann. § 39-17-1366 ............................................................. 20

Tex. Gov't Code Ann. § 411.174 ........................................................... 20

## Laws & Regulations

*States*

Utah Code Ann. § 53-5-704 ....................................................................... 20

Va. Code Ann. § 18.2-308.02 ..................................................................... 20

Ch. 1 (1785), 12 *Virginia Statutes at Large* 9
    (W. W. Hening, ed., 1823) ............................................................. 23, 28

W. Va. Code § 61-7-4 ................................................................................. 20

Wis. Stat. § 175.60 ..................................................................................... 20

Wyo. Stat. Ann. § 6-8-104 .......................................................................... 20

## Miscellaneous Authorities

Assembly Sponsor's Mem. A41001 (2022),
    https://nyassembly.gov/leg/?default_fld=&leg_video=
    &bn=A41001&term=2021&Memo=Y ..................................................... 8

Baron de Stuben, *Regulations for the Order and Discipline
    of the Troops of the United States* (1794),
    https://digirepo.nlm.nih.gov/ext/mhl/2575061R/
    PDF/2575061R.pdf ................................................................................. 28

Joseph J. Vince et al., *Firearms Training & Self-Defense: Does
    the Quality and Frequency of Training Determine the
    Realistic Use of Firearms by Citizens for Self-Defense?* (2015),
    https://www.multivu.com/players/English/65360-ngvac-
    national-gun-victims-tell-and-compel-we-re-done-
    asking/flexSwf/impAsset/document/c6b7ad45-3bc2-4483-
    9de1-4dc5dc9d449f.pdf ........................................................................ 35

Mitchell L. Doucette et al., *Impact of Changes to Concealed-
    Carry Weapons Laws on Fatal and Nonfatal Violent Crime,
    1980-2019*, 192 Am. J. Epidemiology 342 (2023) ........................... 34-35

**Miscellaneous Authorities** **Page(s)**

Press Release, N.Y. Off. of the Governor, *Governor Hochul*
*Signs Landmark Legislation to Strengthen Gun Laws and*
*Bolster Restrictions on Concealed Carry Weapons in Response*
*to Reckless Supreme Court Decision* (July 1, 2022),
https://www.governor.ny.gov/news/governor-hochul-signs-
landmark-legislation-strengthen-gun-laws-and-bolster-
restrictions ........................................................................ 27

Senate Sponsor's Mem. S51001 (2022),
https://www.nysenate.gov/legislation/bills/2021/s51001 ..................... 8

## PRELIMINARY STATEMENT

The New York Legislature enacted the Concealed Carry Improvement Act (CCIA) to update the State's firearm laws following the U.S. Supreme Court's decision in *New York State Rifle & Pistol Association v. Bruen*, 142 S. Ct. 2111 (2022). Plaintiff Jonathan Corbett filed this action challenging the constitutionality of certain CCIA provisions, including a requirement that applicants for licenses to carry firearms complete firearm training.[1] The District Court for the Southern District of New York (Schofield, J.) declined to preliminarily enjoin enforcement of the challenged provisions. Corbett appeals only the district court's decision on the training requirement.

This Court should affirm. The district court correctly concluded that Corbett has not proven entitlement to a preliminary injunction because he has no likelihood of success on the merits of his challenge. Corbett's

---

[1] This brief is filed on behalf of the state defendants: Kathy Hochul, in her official capacity as Governor; Letitia James, in her official capacity as Attorney General; and Steven Nigrelli, in his official capacity as Acting Superintendent of the New York State Police. Acting Superintendent Nigrelli was automatically substituted as a defendant after the prior Superintendent left government service. The non–state defendants are represented by separate counsel.

claim fails at the outset because the Second Amendment does not cover carrying firearms in public without any training. Rather, the Second Amendment protects the right of law-abiding, *responsible* citizens to bear firearms, and the CCIA's training requirement helps ensure that permit recipients are law-abiding and responsible.

In any event, even if the Second Amendment applies to Corbett's desired conduct, there is a rich history of analogous training requirements from the Founding era. Although required firearm training in that era was associated with militia service, that fact merely underscores that the typical use of firearms in that time of martial threat was not the same as today. The historical analogues do not need to be identical to the CCIA's training provision to support its constitutionality, and the training then and now remains relevantly similar in seeking to ensure safe and effective use of firearms.

Moreover, Corbett's claim is independently barred because he lacks standing for his claims against the state defendants. The state defendants would not be responsible for, or able to redress, any injury Corbett would suffer from a license denial. Rather, it is local licensing officers who are tasked with enforcing the licensing requirements. In any event, Corbett

2

has not at this point suffered any injury because his license application has not been denied.

Corbett also has not satisfied his burden to prove that the equities support a preliminary injunction. Any inconvenience to Corbett from completing training is vastly outweighed by the grave risk of harm to the public if New Yorkers are permitted to carry firearms publicly with no training. And a preliminary injunction would be particularly inappropriate here because it would upend the status quo, i.e., implementation of the training requirement, which has been effective since last September and is consistent with training requirements enacted by more than 40 other States.

## ISSUE PRESENTED

1.      Was Corbett unlikely to succeed on the merits of his challenge to the CCIA's firearm training requirement, when (a) that requirement is consistent with the Second Amendment's text and history, and (b) Corbett in any event lacks standing to assert his challenge against the state defendants?

3

2.     Alternatively, did Corbett fail to satisfy his burden to demonstrate that the equities and public interest support a preliminary injunction of the training requirement?

## STATEMENT OF THE CASE

### A.     Legal Background

#### 1.     The U.S. Supreme Court's decision in *New York State Rifle & Pistol Association v. Bruen*

Like dozens of States, New York requires a license to carry a concealed handgun in public. *See, e.g.*, Penal Law §§ 265.03 (criminalizing possession of loaded handgun), 265.20(a)(3) (exempting license holders). Until recently, New York required an applicant to demonstrate "proper cause" to obtain a concealed-carry license. *Id.* § 400.00(2)(f) (effective through June 23, 2022). In *Bruen*, the U.S. Supreme Court concluded that insofar as this "proper cause" requirement demanded showing "a special need for self-defense," the requirement implicated the Second Amendment right of law-abiding, responsible citizens to carry arms in public for self-defense and was invalid because it was unsupported by historical tradition. 142 S. Ct. at 2122, 2130-31.

*Bruen* rejected the framework previously used by nearly all federal courts of appeal to evaluate Second Amendment challenges, substituting a restated standard. The new standard requires the plaintiff to show that "the Second Amendment's plain text covers an individual's conduct." If the plaintiff makes that showing, then the government seeking to regulate the conduct at issue "must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." *Id.* at 2126; *see also id.* at 2129.

*Bruen* recognized the necessity and constitutionality of modern firearm regulation. The Court explained that "nothing in [its] analysis" was meant to undermine the constitutionality of "shall-issue" licensing regimes. *Id.* at 2138 n.9. The laws establishing such shall-issue regimes "often require applicants to undergo a background check or pass a firearms safety course," and "are designed to ensure only that those bearing arms in the jurisdiction are, in fact, 'law-abiding, responsible citizens.'" *Id.* (quoting *District of Columbia v. Heller*, 554 U.S. 570, 635 (2008)); *see also id.* at 2161-62 (Kavanaugh, J., concurring).

*Bruen* acknowledged that the application of the restated Second Amendment standard would require further development in the lower

5

courts. For example, the court declined to "undertake an exhaustive historical analysis of the full scope of the Second Amendment." *Id.* at 2134 (quotation and alteration marks omitted). *Bruen* instructed that the historical inquiry required in Second Amendment cases "will often involve reasoning by analogy," including consideration of "whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified." *Id.* at 2132-33. The Court declined to "provide an exhaustive survey of the features that render regulations relevantly similar." *Id.* at 2132. The Court explained that while, in some cases, historical analogies will be "relatively simple to draw," in other cases "unprecedented societal concerns or dramatic technological changes may require a more nuanced approach." *Id.*

*Bruen* also cautioned that its standard is not intended to be a "regulatory straightjacket" and that governments are not required to identify "historical twin[s]" or "dead ringer[s]" to support modern firearm regulations. *Id.* at 2133. The Court recognized that "[t]he regulatory challenges posed by firearms today are not always the same as those that preoccupied the Founders in 1791," and further underscored that "the

6

Constitution can, and must, apply to circumstances beyond those the Founders specifically anticipated." *Id.* at 2132. Accordingly, when "[p]roperly interpreted, the Second Amendment allows a 'variety' of gun regulations," including regulations that require "training in firearms handling and in laws regarding the use of force." *Id.* at 2162 (Kavanaugh, J., concurring) (quoting *Heller*, 554 U.S. at 636).

## 2.    New York's Concealed Carry Improvement Act

The day after *Bruen* was decided, Governor Hochul announced that she would convene an extraordinary legislative session to bring New York's law into compliance with the ruling. *See* N.Y. Gov., Proclamation (June 24, 2022).[2] On July 1, 2022, the Legislature passed the CCIA, which removed the proper-cause requirement that *Bruen* had declared unconstitutional and made several other changes to New York's firearm licensing and possession laws to ensure that individuals now permitted to carry firearms would do so safely. *See* Ch. 371, 2022 N.Y. Laws (N.Y.

---

[2] For sources available online, full URLs appear in the Table of Authorities. All URLs were last visited on June 13, 2023.

7

Legis. Retrieval Sys.); *see also* Assembly Sponsor's Mem. A41001 (2022); Senate Sponsor's Mem. S51001 (2022).

Among other things, the CCIA required that applicants for licenses to carry concealed firearms in public complete firearm training. The training requirement applies to licenses issued on or after the CCIA's September 1, 2022, effective date. *See* Ch. 371, 2022 N.Y. Laws. Applicants must complete a sixteen-hour, in-person firearm safety course conducted by an authorized instructor, and two hours of live-fire instruction, Penal Law § 400.00(19). The firearm safety course must cover at least the following topics: "(i) general firearm safety; (ii) safe storage requirements and general secure storage best practices; (iii) state and federal gun laws; (iv) situational awareness; (v) conflict de-escalation; (vi) best practices when encountering law enforcement; (vii) . . . statutorily defined sensitive [and restricted] places . . . ; (viii) conflict management; (ix) use of deadly force; (x) suicide prevention; and (xi) the basic principles of marksmanship." *Id.* License applicants must submit a certificate of completion for the required training during their application interview with a licensing officer. *Id.* § 400.00(1)(o)(iii).

8

## B.   Procedural Background

### 1.   Corbett's lawsuit and motion for a preliminary injunction

In April 2022, plaintiff Jonathan Corbett submitted an application to the New York City Police Department Licensing Division, seeking a license to carry a concealed handgun in public. (Joint Appendix (J.A.) 5.)

While Corbett was awaiting the scheduling of an application interview with a city licensing officer, the CCIA was enacted. Shortly thereafter, in July 2022, Corbett filed this lawsuit in the U.S. District Court for the Southern District of New York. His initial complaint named only Governor Hochul, in her official capacity, as a defendant. (J.A. 246-247.) Corbett brought a claim pursuant to 42 U.S.C. § 1983, alleging that the CCIA's training requirement violates the Second Amendment on its face. (J.A. 11.) Corbett also brought constitutional claims challenging the CCIA's requirements that applicants provide character references and a list of recent social media accounts (J.A. 8, 10-11), but those claims are not at issue on this appeal.

Six weeks after filing his lawsuit, and shortly before the CCIA was scheduled to take effect, Corbett sought a preliminary injunction. (J.A. 248.) In response, Governor Hochul explained that she was an

9

improper defendant because New York City licensing officials, not the Governor, enforce the licensing requirements Corbett challenged. (Dist. Ct. ECF No. 15 at 13-15, 17-19.) Corbett thereafter filed the operative amended complaint, naming several additional defendants, including officials from New York City and additional state officials, all in their official capacities. (J.A. 3-12, 250.) Two weeks after Corbett filed his amended complaint, and nearly a month after the CCIA had taken effect, Corbett filed the operative preliminary injunction motion on appeal here. (J.A. 13-29, 253.)

### 2. The district court's denial of Corbett's preliminary injunction motion

The district court (Schofield, J.) denied Corbett's motion for a preliminary injunction. (J.A. 235-236.)

The district court first found that Corbett lacked standing to challenge the CCIA's character-reference and social-media listing require-ments, because those requirements are applicable only to individuals who—unlike Corbett—submit license applications *after* the CCIA has gone into effect. (J.A. 236-237.)

But the court assumed without deciding that Corbett had standing to challenge the CCIA's training requirement. The court reasoned that the training requirement applies to individuals who receive licenses after the CCIA took effect, even if they submitted applications before the CCIA—as Corbett did here. The court recognized that a plaintiff ordinarily does not have standing to challenge a firearm licensing requirement unless the plaintiff has been denied a license for failure to satisfy that requirement. And the court recognized that Corbett's license application had not been denied. But the court nevertheless assumed without deciding that Corbett had standing because his application was purportedly futile given his refusal to complete the required training. (J.A. 237-238.) The court did not address the state defendants' separate argument that Corbett lacks standing to sue them because none of them is a proper defendant here.

The district court then found that Corbett failed to establish a likelihood of success on his Second Amendment challenge to the CCIA's training requirement. The court explained that the defendants had demonstrated that there is ample historical precedent for the training requirement, and that Corbett had failed to provide any contrary

11

evidence. As the court explained, Founding-era laws had required firearm training that was substantially more onerous than the training required by the CCIA. (J.A. 239-240.) The court further explained that even if these historical requirements differed in certain ways from the CCIA's requirements, *Bruen* did not require defendant to "identify an historical twin" to support the CCIA's training provision. (J.A. 240.)

Corbett appealed from only that portion of the district court's decision that concerns the firearm training requirement. He expressly did not appeal from the portions that concern the character-reference and social-media listing requirements. *See* Br. of Pl.-Appellant (Br.) at 7.

## STANDARD OF REVIEW

A preliminary injunction is "an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). Movants must establish that (1) they are likely to succeed on the merits; (2) they are likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in their favor; and (4) an injunction

is in the public interest. *Id.* at 20.[3] Where, as here, an injunction would alter the status quo, i.e., the implementation of a duly enacted law, movants are held to a "heightened" standard that requires a "clear" or "substantial" likelihood of success on the merits and a "strong showing" of irreparable harm. *New York ex rel. Schneiderman v. Actavis PLC*, 787 F.3d 638, 650 (2d Cir. 2015) (quotation marks omitted); *see also Citigroup Glob. Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 35 n.4 (2d Cir. 2010).

On appeal, this Court reviews a decision denying a preliminary injunction for abuse of discretion. *Connecticut State Police Union v. Rovella*, 36 F.4th 54, 61 (2d Cir.), *cert. denied*, 143 S. Ct. 215 (2022).

## SUMMARY OF ARGUMENT

The district court properly declined to preliminarily enjoin enforcement of the CCIA's training requirement.

---

[3] Contrary to Corbett's suggestion (Br. at 8-9), the district court did nothing improper in declining to separately analyze the latter three requirements. Because movants must satisfy *all* the requirements, *see, e.g.*, *Winter*, 555 U.S. at 24, Corbett's failure to satisfy the first requirement was itself dispositive.

13

I. The district court correctly concluded that Corbett has not shown a likelihood of success on the merits of his challenge. That is so for multiple reasons.

I.A.1. Corbett has not met his initial burden under *Bruen* to demonstrate that the Second Amendment's text protects his desired conduct of carrying firearms in public without any training. The Second Amendment protects only a right to bear arms *with proper training*, as the Supreme Court recognized in *Heller*. Accordingly, as the Court acknowledged in *Bruen*, firearm training requirements are lawful, and courts need not conduct a historical inquiry to reach that conclusion, *see* 142 S. Ct. at 2138 n.9. Indeed, the vast majority of States have adopted training requirements similar to New York's requirement.

I.A.2. Regardless, the CCIA's firearm training requirement is consistent with the history of the Second Amendment right, and thus constitutional. When the Second Amendment was enacted, there were firearm training requirements across the country analogous to the CCIA's training requirements. Indeed, many of the Founding-era requirements were more onerous than the CCIA's requirements, mandating in-person training four or more times per year.

14

Although the Founding-era and the CCIA training requirements did not have precisely the same content and goals, the basic purpose of each was the same: to ensure that those using firearms did so safely and effectively. Any distinctions between the requirements merely reflect that the regulatory challenges of the Founding era, when America faced serious military threats, were not the same as the challenges faced in our modern era of non-military, society-wide gun violence. And *Bruen* is clear that the State need identify only "a well-established and representative historical *analogue*, not a historical *twin*." 142 S. Ct. at 2133. The Founding-era training requirements easily satisfy this standard.

I.B.1. Corbett is also unlikely to succeed on the merits of his claim against the state defendants because he lacks standing, and the Court may affirm on this alternative ground. Local licensing officers, not the state defendants, decide license applications and enforce the training requirement. Thus, any injury from being denied a license for failure to complete the training requirement would not be traceable to, or redressable by, the state defendants.

I.B.2. In any event, Corbett also lacks the concrete injury needed for standing because his license application has not been denied. And he

cannot manufacture standing by refusing to submit to the required training. *See Libertarian Party of Erie Cnty. v. Cuomo*, 970 F.3d 106, 116 (2d Cir. 2020), *abrogated on other grounds by Bruen*, 142 S. Ct. 2111 (2022).

II. Corbett also failed to meet his burden to prove that he satisfied the equitable requirements for a preliminary injunction. Indeed, the equities weigh strongly against an injunction. Public safety would be put at serious risk by a statewide injunction enjoining enforcement of the firearm safety training requirement. And interrupting the status quo operation of the requirement would defy the purpose of a preliminary injunction, confuse enforcement, and disrupt reliance interests of private training providers. Such statewide harms far outweigh any modest inconvenience to Corbett from completing the training.

16

# ARGUMENT

## POINT I

### CORBETT IS EXCEEDINGLY UNLIKELY TO SUCCEED ON THE MERITS OF HIS SECOND AMENDMENT CLAIM AGAINST THE STATE DEFENDANTS

Corbett has not demonstrated a likelihood of success on the merits of his challenge to the CCIA's training requirement. As the district court correctly found, the training requirement is consistent with the Second Amendment. And the Court may also affirm on the independent ground that Corbett lacks standing to bring his claim against the state defendants.

## A. The Training Requirement Is Consistent with the Second Amendment.

### 1. The Second Amendment's text does not protect carrying firearms without any training.

Corbett's Second Amendment challenge to the training requirement fails at the outset because Corbett has not shown that the Second Amendment protects his desired conduct of carrying firearms publicly without any training. *Bruen* made clear that the government's burden to support a firearm regulation with historical evidence is triggered only upon a predicate showing by the plaintiff that the regulation restricts

17

conduct covered by the Second Amendment. *See* 142 S. Ct. at 2126, 2129-30. Here, Corbett failed to show that the CCIA's training requirement restricts conduct covered by the Second Amendment.

The Second Amendment provides that "[a] well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. As the Supreme Court held in *District of Columbia v. Heller*, "the adjective 'well-regulated'" in the Second Amendment refers to "the imposition of proper discipline and training." 554 U.S. 570, 597 (2008) (citing historical definitional sources). As the Court explained, a "'well-regulated militia'" "'cannot exist unless the people are trained to bearing arms.'" *Id.* at 617 (quoting Thomas Cooley, *Treatise on Constitutional Limitations* 350 (1868)). And the Supreme Court made clear that the phrase to "bear arms" in the Second Amendment itself "implies something more than the mere keeping; it implies the learning to handle and use [arms] in a way that makes those who keep them ready for their efficient use." *Id.* at 617-18 (quoting Cooley, *supra*, at 271).

Moreover, the Supreme Court has repeatedly explained that the "people" with a right to bear arms under the Second Amendment are

18

limited to "law-abiding, responsible citizens." *Bruen*, 142 S. Ct. at 2138 n.9 (quoting *Heller*, 554 U.S. at 635); U.S. Const. amend. II. Those who have refused to complete training on the safe use of firearms are not among the responsible citizens to whom the Second Amendment gives a right to bear such arms. Indeed, the Supreme Court explicitly concluded in *Bruen*, without conducting any historical analysis, that the Second Amendment permits "shall-issue" firearm licensing regimes that often require applicants to "pass a firearms safety course." 142 S. Ct. at 2138 n.9. As the Court explained, such requirements are "designed to ensure only that those bearing arms in the jurisdiction are, in fact, 'law-abiding, responsible citizens.'" *Id.* (quoting *Heller*, 554 U.S. at 635); *see also id.* at 2161-62 (Kavanaugh, J., concurring). New York's required firearm safety course is precisely such a requirement.

Thus, the plain text of the Second Amendment right, as repeatedly interpreted by the Supreme Court, protects only carrying firearms *with appropriate training*. The district court's observation in passing that the Second Amendment's plain text covers "carry[ing] a handgun in public" (J.A. 239) missed the relevant distinction: that the plain text, as interpreted

in *Heller* and *Bruen*, does not cover carrying a handgun in public *without training*.

Presumably recognizing that the Second Amendment does not protect carrying firearms without training, other jurisdictions across the country have long had safety training requirements for firearm carrying licenses that are similar to New York's requirement. Indeed, the vast majority of States—at least 41—have such requirements.[4] For instance, like New York, the District of Columbia requires sixteen hours of in-class

---

[4] *See* Alaska Stat. § 18.65.715; Ariz. Rev. Stat. § 13-3112(N); Ark. Code Ann. 5-73-309(13); Cal. Penal Code §§ 26150(a)(4), 26165; Colo. Rev. Stat. § 18-12-203(1)(h); Conn. Gen. Stat. § 29-28(b); D.C. Code § 7-2509.02(a)(4); Del. Code Ann. tit. 11, § 1441(a)(3); Fla. Stat. § 790.06(2)(h); Haw. Rev. Stat. Ann. § 134-2(g); Idaho Code § 18-3302(9); 430 Ill. Comp. Stat. 66/75(b); Iowa Code § 724.9; Kan. Stat. Ann. § 75-7c04(b); Ky. Rev. Stat. Ann. 237.110(4)(i); La. Rev. Stat. § 40:1379.3(D); Md. Code Ann., Pub. Safety § 5-306(a)(5); Me. Rev. Stat. Ann. tit. 25, § 2003(1)(E)(5); Mass. Gen. Laws ch. 140, § 131P(a); Mich. Comp. Laws § 28.425b(7)(c); Minn. Stat. § 624.714(2a); Mo. Rev. Stat. § 571.111; Mont. Code Ann. § 45-8-321(3); Neb. Rev. Stat. §§ 69-2432, 69-2433(10); Nev. Rev. Stat. § 202.3657(3)(c); N.J. Admin. Code § 13:54-2.4(b); N.M. Stat. Ann. § 29-19-7; N.C. Gen. Stat. § 14-415.12(a)(4); N.D. Cent. Code § 62.1-04-03(1)(d), (2); Ohio Rev. Code Ann. § 2923.125(B)(3); Okla. Stat. tit. 21, § 1290.12(A)(2); Or. Rev. Stat. § 166.291(1)(f); 11 R.I. Gen. Laws § 11-47-15; S.C. Code Ann. § 23-31-215(A)(5); Tenn. Code Ann. § 39-17-1366(b)(4); Tex. Gov't Code Ann. § 411.174(a)(7); Utah Code Ann. § 53-5-704(8); Va. Code Ann. § 18.2-308.02(B); W. Va. Code § 61-7-4(e); Wis. Stat. § 175.60(4)(a); Wyo. Stat. Ann. § 6-8-104(b)(vii). In some of these States, there are certain circumstances where firearm carrying is permitted without training.

20

and two hours of live-fire training. *See* D.C. Code § 7-2509.02(a)(4). Illinois and Maryland also require "at least 16 hours" of training, 430 Ill. Comp. Stat. 66/75(b); *accord* Md. Code Ann., Pub. Safety § 5-306(a)(5), and New Mexico requires "not less than fifteen hours." N.M. Stat. Ann. § 29-19-7(A). Alaska requires "at least 12 hours of training" and "a test of competence with a handgun." Alaska Admin. Code tit. 13, § 30.070(a)(1)(A); *see* Alaska Stat. § 18.65.715. And Corbett has not cited a single case finding any such requirement unconstitutional; nor are the state defendants aware of any such case.

### 2.    In any event, the training requirement is consistent with history and tradition.

Because the Second Amendment's text does not protect carrying firearms without training, defendants were not required to proffer historical evidence to support the training requirement. But even if such a showing were required, the historical record confirms that the training requirement is consistent with history and tradition. Accordingly, the CCIA's training requirement is constitutional—as the district court correctly concluded.

The history of the Second Amendment right is deeply tied to the need for training to exercise that right safely and effectively. Since the Founding, training in the use of arms was required as part of a citizen's mandatory duty to serve in the local militia. Indeed, during the period surrounding the Second Amendment's enactment, both state and federal law required that all citizens deemed able to engage in extensive arms training do so in person. For instance, a 1780 New York law required "every able bodied male person . . . residing within this State, from sixteen years of age to fifty" to be enrolled in the state militia, and required commanding officers to cause the militia members "to be sufficiently exercised, trained and disciplined, for their instruction and improvement" "in and to the use of arms." (J.A. 113, 115.) Similarly, an early federal Militia Act, passed in 1792 to establish militia standards for the States to follow, required "[t]hat each and every free able-bodied white male citizen" between the ages of 18 and 45 must "be enrolled in the militia," and that "it shall be the duty of the commanding officer at every muster . . . to cause the militia to be exercised and trained." *See* Militia Act of 1792, ch. 33, §§ 1, 7, 1 Stat. 271, 273. These early American militia training requirements have even deeper roots in English militia laws that gave

officers power "to train . . . the persons so to be armed arrayed and weaponed." (*See, e.g.*, J.A. 84 (1662 law).)

Contrary to Corbett's suggestion (Br. at 9), these Founding-era training requirements imposed burdens comparable to those imposed by the CCIA's training requirement. *See Bruen*, 142 S. Ct. at 2132-33 (identifying "comparable burden on the [Second Amendment] right" as relevant to the "analogical inquiry"). Indeed, the Founding-era training requirements were often *far more* burdensome than the CCIA's requirement of a total of 18 hours of training. In New York, for example, in-person trainings were required at least four times per year in the Founding era. (J.A. 115.) And other States in that era and shortly thereafter similarly required extensive training multiple times per year. For instance, in 1784, Georgia required training up to six times per year. Act of Feb. 26, 1784, 19 *The Colonial Records of the State of Georgia*, pt. 2, at 350-51 (Allen D. Candler, comp., 1911). In 1785, Virginia law required training every two months. Ch. 1 (1785), 12 *Virginia Statutes at Large* 9, 11, 15 (W. W. Hening, ed., 1823). And a New Jersey law from 1806 required training three times a year, for up to six hours per day. (J.A. 130-131; *see also* J.A. 87 (English requirement for training as many

as five times a year, for up to two to four days on each occasion).) Moreover, travel to and from these frequent trainings was much more onerous in the Founding era than it would be today.

Requiring individuals to bear the reasonable costs of their firearm training is also deeply rooted in historical tradition. Founding-era militia statutes, including New York's statute, required militia members to pay for the requirements for service—including their arms and ammunition—at their "own expen[s]e." (J.A. 114; *see also, e.g*, Militia Act, ch. 33, § 4, 1 Stat. at 272-73 (arms, ammunition, and uniforms must be "furnished at [militia members'] own expense"); 1792 N.H. Laws 446 (same); Act of Nov. 15, 1778, 19 *The Colonial Records of the State of Georgia*, *supra*, pt. 2, at 108 (militia member "shall constantly keep and bring with him, to such training" arms, ammunition, and "accoutrements").) Similarly, Founding-era militia statutes did not require that States compensate citizens for their time spent in training, instead reserving wages for times of "actual service" in the militia. (J.A. 117; *accord, e.g*., Ch. 1, 12 *Virginia Statutes at Large* at 11, 18.)

Corbett also misses the mark in contending (Br. at 10-13) that the Founding-era tradition of firearm training did not apply to precisely the

same people or have precisely the same content and goals as the CCIA's training requirement. As Corbett acknowledges (Br. at 10), and as the district court correctly noted (J.A. 240), *Bruen* "requires only that the government identify a well-established and representative historical *analogue*, not a historical *twin*." 142 S. Ct. at 2133. Here, historical training requirements are "relevantly similar" to the CCIA's training requirement in not only their burdens but also their justifications of ensuring safe and effective use of firearms. *See id.* at 2132-33.

As another district court recently explained in rejecting a challenge to the CCIA's training requirement, the basic "how and why," *id.*, of the CCIA's requirement and Founding-era precursors are the same. *See Antonyuk v. Hochul*, No. 22-cv-0986, 2022 WL 16744700, at *56 (N.D.N.Y. Nov. 7, 2022). Specifically, both require individuals bearing arms to complete training with the aim of ensuring that those possessing firearms are familiar with firearm use and do not "pose a danger to themselves or others." Indeed, although the *Antonyuk* court preliminarily enjoined enforcement of other provisions of the CCIA, the court declined to enjoin enforcement of the CCIA's training requirement, finding that the

requirement was amply supported by historical tradition. *See id.* at *55-56.[5]

Corbett misplaces his reliance on the fact (Br. at 11-12) that not everyone living in the Founding era was required to participate in the militia and thus subjected to historical firearm training requirements, whereas the CCIA's training requirement applies more broadly. In the Founding era, militia membership and associated training were required of all adult males deemed able to safely bear arms. (*See, e.g.*, J.A. 113.) And these same able adult males would have constituted the vast majority of those exercising a Second Amendment right to bear arms.

In addition, while the CCIA's training requirement applies to some people who would not have been covered by Founding-era training requirements, that fact simply underscores that "[t]he regulatory challenges posed by firearms today are not always the same as those that preoccupied the Founders in 1791." *Bruen*, 142 S. Ct. at 2132. For example, during the Founding era, States facing "external invasions, and

---

[5] The defendants appealed the preliminary injunction order in that case; that appeal is pending. *See Antonyuk v. Hochul*, No. 22-2908(L) (2d Cir.). The *Antonyuk* plaintiffs did not, however, cross-appeal the denial of a preliminary injunction as to the training requirement.

internal commotions and insurrections" were acutely concerned with safely training and managing an armed militia. (J.A. 113.) By contrast, today, States are reasonably concerned with addressing a society-wide gun violence epidemic.[6] And the Supreme Court was clear in *Bruen* that "the Constitution can, and must, apply to circumstances beyond those the Founders specifically anticipated." *Id.*

Corbett incorrectly assumes (Br. at 12) that the Founding era's training requirements did not involve firearm safety, as the CCIA's training requirement does. In fact, Founding-era militia laws specifically required training "in and to the use of arms," i.e., training on the safe and effective use of firearms. (J.A. 115.) The Founding-era laws also often specifically prescribed training in the "instructions laid down by the Baron Steuben." (*E.g.*, J.A. 131; *see also, e.g.*, Militia Act, ch. 33, § 7, 1 Stat. at 273 (requiring that state militias provide training "agreeably"

---

[6] *See, e.g.*, Press Release, N.Y. Off. of the Governor, *Governor Hochul Signs Landmark Legislation to Strengthen Gun Laws and Bolster Restrictions on Concealed Carry Weapons in Response to Reckless Supreme Court Decision* (July 1, 2022) (quoting Governor and legislative leaders explaining that CCIA was intended largely "to combat the gun violence epidemic").

to Steuben's rules);[7] Ch. 1, 12 *Virginia Statutes at Large* at 11, 15 (similar).) Baron Steuben's manual, in turn, includes extensive instruction on firing arms, and the need for captains to "teach [militia members] the fire by platoons," and for all officers "to be perfectly acquainted with the . . . firings, that they may be able to instruct their soldiers when necessary." Baron de Stuben, *Regulations for the Order and Discipline of the Troops of the United States*, *supra*, at 3, 5-17, 35-36. The manual further emphasizes that a militia member "must accustom himself to the greatest steadiness under arms." *Id.* at 79. And common sense underscores that an integral component of training for militia readiness is training on how to use one's firearm in a manner that does not harm oneself or other militia members—the same type of firearm safety concern that animates the CCIA's training requirement.

---

[7] The Militia Act refers to Steuben's rules as "the Rules of discipline, approved and established by Congress in their resolution of the twenty-ninth of March, one thousand seven hundred and seventy-nine." Militia Act, ch. 33, § 7, 1 Stat. at 273; *see also* Baron de Stuben, *Regulations for the Order and Discipline of the Troops of the United States* 2 (1794) (copying March 29, 1779 congressional resolution establishing Steuben's rules).

Contrary to Corbett's argument (Br. at 13), the CCIA's training requirement is similar to the Founding-era's militia training requirements in covering both safety and efficacy in the use of firearms. For instance, the CCIA training is expressly required to cover topics such as "basic principles of marksmanship." *See* Penal Law § 400.00(19). And the CCIA further requires live-fire training, *see id.*, just as Founding-era statutes did, see *supra* at 27-28. And to the extent that the CCIA places more emphasis on safety than Founding-era statutes did, such minor differences do not undermine the CCIA's constitutionality. Modern training requirements—enacted during an era of fewer military threats and more non-military gun violence inflicted by more lethal firearm technology—need not be identical to Founding-era training requirements to comport with the Second Amendment. As the Supreme Court explained in *Bruen*, such "unprecedented societal concerns and dramatic technological changes may require a more nuanced approach" to historical analogy—not a historical "straightjacket." *See* 142 S. Ct. at 2132-33.

**B.    Alternatively, Corbett Lacks Standing to Pursue His Claim Against the State Defendants.**

Although the district court assumed without deciding that Corbett has standing to challenge the CCIA's training requirement, Corbett in fact lacks standing to bring his claim against the state defendants. The Court may affirm on this alternative ground.

The "irreducible constitutional minimum" of standing consists of three elements: "[t]he plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (quotation marks omitted). Here, any injury Corbett might suffer from denial of his firearm license application for failure to complete the required training would not be traceable to, or redressable by, the state defendants. And in any event, Corbett has not suffered a sufficiently concrete or imminent injury because his application has not been denied.

30

### 1. Corbett's alleged injury would not be traceable to, or redressable by, the state defendants.

Under New York's firearm licensing laws, only the local licensing officer for the city or county where the applicant lives or works—not a state official—may process and decide applications for firearm carrying licenses. *See* Penal Law § 400.00(1), (3)(a). In New York City, where Corbett filed his application and where he allegedly lives (J.A. 4), the licensing officer is the city police commissioner. *See* Penal Law § 265.00(10). Accordingly, the New York City police commissioner—not any state official—will decide Corbett's permit application and enforce the training requirement, as she deems appropriate. Thus, no state official is a proper defendant here because Corbett has not identified any potential injury that would be traceable to the state defendants. Nor would the state defendants be able to redress Corbett's alleged injury even if the Court were to issue an injunction requiring that Corbett be issued a license regardless of his satisfaction of the training requirement.

This Court's decision in *Libertarian Party* is particularly instructive. In *Libertarian Party*, this Court affirmed the dismissal of the Governor, Attorney General, and Superintendent of the State Police—the same state defendants that Corbett sued here—as defendants in a

lawsuit challenging the denial of firearm license applications. *See* 970 F.3d at 122. As the Court explained, these state defendants were not proper defendants because "the only defendants to whom [the plaintiffs'] alleged injuries were fairly traceable were the [local licensing officers] who denied their respective applications." *Id.* The same reasoning establishes that the state defendants are not proper defendants here.

Although the Superintendent of the State Police must approve the curriculum of firearm safety courses that provide the statutorily required training, *see* Penal Law § 400.00(19), Corbett does not claim any injury from the content of a training curriculum prescribed by the Superintendent. Thus, Corbett claims no injury that would be traceable to the Superintendent, or that the Superintendent would be able to redress.

For similar reasons, because the state defendants play no role in the enforcement of the licensing requirement Corbett challenges, the state defendants are entitled to Eleventh Amendment immunity from Corbett's lawsuit. The *Ex parte Young* exception to Eleventh Amendment immunity does not apply here because the state defendants are not

connected to enforcement of the training requirement. *See In re Dairy Mart Convenience Stores, Inc.*, 411 F.3d 367, 372-73 (2d Cir. 2005).

## 2. Corbett has not suffered a concrete injury in fact.

In addition, Corbett has not suffered any concrete injury, as required to have standing. In a challenge to a firearm licensing requirement, the license application "denial . . . is [the] distinct injury." *Parker v. District of Columbia*, 478 F.3d 370, 376 (D.C. Cir. 2007). It is therefore well settled that, "[i]n order to challenge the New York firearm licensing laws, a person must either have applied for and been denied a license or make a substantial showing that his or her application would have been futile." *Libertarian Party*, 970 F.3d at 116 (quotation marks omitted).

Here, Corbett has not been denied a firearm license. Rather, his application remains pending. Although the district court assumed that Corbett's application was likely to be futile because he does not intend to complete the required training (J.A. 239), this Court has made clear that a plaintiff cannot manufacture standing by simply refusing to "submit to the challenged policy." *Libertarian Party*, 970 F.3d at 121 (quotation marks omitted). "[M]ere objection or antipathy to the law does not

constitute a showing of futility." *Id.* at 116. Accordingly, Corbett lacks standing to challenge the training requirement.

## POINT II

### THE PUBLIC INTEREST AND BALANCE OF THE EQUITIES ALSO WEIGH STRONGLY AGAINST A PRELIMINARY INJUNCTION

Corbett makes no argument about the remaining preliminary-injunction factors—irreparable harm, the balance of equities, and the public interest—and has thus forfeited any such argument. In any event, those equitable factors weigh overwhelmingly against an injunction—particularly given that the injunction Corbett seeks would upend the status quo, which is the enforcement of the CCIA's training requirement.

*First*, there is a serious risk of physical injury or death if an injunction is entered. As empirical evidence demonstrates, firearm training reduces injury and death from firearm use. For instance, researchers conducting a recent peer-reviewed study found that shall-issue licensing regimes with live-fire training requirements, like the CCIA's requirements, were associated with fewer dangerous firearm incidents as compared to shall-issue regimes without such requirements. *See* Mitchell L. Doucette et al., *Impact of Changes to Concealed-Carry*

*Weapons Laws on Fatal and Nonfatal Violent Crime, 1980–2019*, 192 Am. J. Epidemiology 342, 350, 352-53 (2023). In another study, participants in a firearm simulator experiment who had lower levels of training performed worse than participants who had higher levels of training. And some of the less trained participants accidentally shot innocent bystanders or unarmed people. *See* Joseph J. Vince et al., *Firearms Training & Self-Defense: Does the Quality and Frequency of Training Determine the Realistic Use of Firearms by Citizens for Self-Defense?* 22-37 (2015). Moreover, the real-life shooting injuries and deaths that might result from an injunction "could not be undone, thus rendering the consequences irreparable." *See Uniformed Fire Officers Ass'n v. De Blasio*, 973 F.3d 41, 48 (2d Cir. 2020).

*Second*, "[a]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers) (quotation marks omitted). That rule applies with particular force here, where the Legislature determined that the CCIA's training requirement is needed to address public-safety concerns. *See id.*

35

*Third*, a preliminary injunction would inappropriately disrupt the status quo. The purpose of a preliminary injunction "is only to *preserve the status quo*" during a lawsuit. *See Kane v. De Blasio*, 19 F.4th 152, 163 (2d Cir. 2021) (per curiam) (quotation marks omitted) (emphasis added). Here, the requested injunction would bar the enforcement of a requirement that has already been in effect since September 2022. There is no plausible basis to reverse the status quo here while Corbett's lawsuit is pending.

Indeed, upending the status quo would harm public agencies and private training providers that have been investing substantial resources in developing training programs that align with the CCIA's standards. These agencies and providers would face serious disruption and expense if enforcement of the training requirement were enjoined. Indeed, if the private providers face substantially diminished interest in their programs because of an injunction, they might well be dissuaded from providing this important training at all—even to individuals who want to complete the training voluntarily. Such disruption and expense constitute irreparable harm that weighs against an injunction. *See, e.g.*, *Romer v. Green Point Sav. Bank*, 27 F.3d 12, 16 (2d Cir. 1994).

*Fourth*, Corbett did not show—much less make a "strong showing"—that, absent a preliminary injunction, he would suffer imminent irreparable harm. *See Actavis*, 787 F.3d at 650 (quotation marks omitted). Indeed, Corbett's delay in filing the preliminary injunction motion at issue, and his failure to seek expedited review at any stage, strongly undermine any claim of irreparable harm. *Cf. Weight Watchers Int'l, Inc. v. Luigino's, Inc.*, 423 F.3d 137, 144 (2d Cir. 2005). And in any event, the harms of exposing New Yorkers to the heightened risk of firearm injury and death and disrupting implementation of the duly enacted law severely outweigh any inconvenience to Corbett from continuing to require the training while this litigation is pending.

## CONCLUSION

For all these reasons, the Court should affirm the district court's order denying a preliminary injunction.

Dated:  New York, New York
June 13, 2023

Respectfully submitted,

LETITIA JAMES
*Attorney General*
*State of New York*
Attorney for State Appellees

By:  */s/ Philip J. Levitz*
PHILIP J. LEVITZ
Assistant Solicitor General

BARBARA D. UNDERWOOD
*Solicitor General*
JUDITH N. VALE
*Deputy Solicitor General*
PHILIP J. LEVITZ
*Assistant Solicitor General*

28 Liberty Street
New York, NY 10005
(212) 416-6325

38

## CERTIFICATE OF COMPLIANCE

Pursuant to Rule 32(a) of the Federal Rules of Appellate Procedure, Alenette B. Jordan, an employee in the Office of the Attorney General of the State of New York, hereby certifies that according to the word count feature of the word processing program used to prepare this brief, the brief contains 6,959 words and complies with the typeface requirements and length limits of Rule 32(a)(5)-(7) and Local Rule 32.1.

*/s/ Alenette B. Jordan*