# 22-3210

## United States Court of Appeals for the Second Circuit

JONATHAN CORBETT,

*Plaintiff-Appellant,*

*against*

KATHLEEN HOCHUL, in her official capacity as Chief Executive of the State of New York, LETITIA JAMES, in her official capacity as Attorney General of the State of New York, ERIC ADAMS, in his official capacity as Mayor of the City of New York, KEECHANT SEWELL, in her official capacity as Police Commissioner of the New York Police Department, INSPECTOR HUGH BOGLE, in his official capacity as Commanding Officer of the New York Police Department, Licensing Division, and KEVIN BRUEN, in his official capacity as Superintendent of the New York State Police,

*Defendants-Appellees.*

On Appeal from the United States District Court for the Southern District of New York

## BRIEF FOR CITY APPELLEES

RICHARD DEARING
CLAUDE S. PLATTON
ELINA DRUKER
 *of Counsel*

June 13, 2023

HON. SYLVIA O. HINDS-RADIX
*Corporation Counsel*
*of the City of New York*
Attorney for City Appellees
100 Church Street
New York, New York 10007
212-356-2609 or -2502
edruker@law.nyc.gov

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........................................................................iii

PRELIMINARY STATEMENT ................................................................ 1

ISSUES PRESENTED FOR REVIEW ...................................................... 4

STATEMENT OF THE CASE .................................................................. 4

    A.  Legal background culminating in the adoption of the CCIA ......................................................................................... 4

    B.  Corbett's pending concealed carry application, lawsuit and his challenge to the training requirement and other provisions of the CCIA .................................................... 8

    C.  The district court's denial of Corbett's motion for a preliminary injunction ................................................................. 9

SUMMARY OF ARGUMENT AND STANDARD OF REVIEW ........... 10

ARGUMENT ........................................................................................ 15

POINT I ............................................................................................... 15

    CORBETT LACKS STANDING BECAUSE HIS APPLICATION HAS NOT BEEN DENIED ................................. 15

POINT II .............................................................................................. 23

    THE DISTRICT COURT CORRECTLY DENIED A PRELIMINARY INJUNCTION ....................................................... 23

    A.  Corbett is not likely to succeed on the merits. ......................... 25

        1. *Bruen* forecloses Corbett's theory that the CCIA's training requirement is too exacting. .................................... 25

i

**TABLE OF CONTENTS (cont'd)**

**Page**

    2. CCIA's training requirement is consistent with the Second Amendment under *Bruen*'s framework. ................... 32

  B. The remaining preliminary injunction factors weigh against an injunction. ................................................. 39

CONCLUSION ........................................................... 43

CERTIFICATE OF COMPLIANCE ....................................... 44

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Agudath Israel of Am. v. Cuomo,*
  983 F.3d 620 (2d Cir. 2020) .......................................................... 10, 24

*Bach v. Pataki,*
  408 F.3d 75 (2d Cir. 2005) .................................................................. 19

*Brokamp v. James,*
  66 F.4th 374, 2023 U.S. App. LEXIS 10343 (2d Cir. 2023).......... 17, 18

*City of N.Y. v. Mickalis Pawn Shop, LLC,*
  645 F.3d 114 (2d Cir. 2011) ................................................................. 40

*Copeland v. Vance,*
  893 F.3d 101 (2d Cir. 2018) ................................................................. 27

*Jackson-Bey v. Hanslmaier,*
  115 F.3d 1091 (2d Cir. 1997) .................................................. 15, 16, 19

*Kane v. De Blasio,*
  19 F.4th 152 (2d Cir. 2021)................................................................... 24

*Libertarian Party v. Cuomo,*
  970 F.3d 106 (2d Cir. 2020) ......................................................... *passim*

*Maryland v. King,*
  567 U.S. 1301, 133 S. Ct. 1 (2012)....................................................... 41

*Miller v. Metro. Life Ins. Co.,*
  979 F.3d 118 (2d Cir. 2020) ................................................................. 15

*Munaf v. Geren,*
  553 U.S. 674 (2008)............................................................................... 24

*New York State Rifle & Pistol Association v. Bruen,*
  142 S. Ct. 2111 (2022)................................................................. *passim*

iii

# TABLE OF AUTHORITIES (cont'd)

**Page(s)**

*Strange v. Searcy,*
    574 U.S. 1145 (2015) ................................................................. 41

*TransUnion LLC v. Ramirez,*
    141 S. Ct. 2190 (2021) ............................................................... 16

*United States v. Decastro,*
    682 F.3d 160 (2d Cir. 2012) ...................................................... 19

*United States v. Miller,*
    307 U.S. 174 (1939) ................................................................... 36

*Waldman Publ'g Corp. v. Landoll, Inc.,*
    43 F.3d 775 (2d Cir. 1994) ........................................................ 40

*We the Patriots USA, Inc. v. Hochul,*
    17 F.4th 266 (2d Cir. 2021) ................................................. 24, 39

*Winter v. NRDC, Inc.,*
    555 U.S. 7 (2008) ....................................................................... 39

## Constitutional Provisions

U.S. Const. amend. XIV ....................................................................... 37

## Laws, Statutes, and Regulations

Federal Militia Act, Second Congress, Sess. I, ch. 33 (1792) ................. 36

21 Okla. Stat. Ann. § 1290.12(A)(2) ..................................................... 30

Alaska Stat. §§ 18.65.705(6) & 18.65.715 ............................................ 30

3 Alaska Admin. Code § 30.070 ............................................................ 30

Ariz. Stat. § 13-3112(E)(6), (N) ........................................................... 30

Ark. Stat. § 5-73-309(13) ..................................................................... 30

# TABLE OF AUTHORITIES (cont'd)

**Page(s)**

Colo. Stat. § 18-12-203(1)(h)(I), (VI) ....................................... 30

Conn. Gen. Stat. § 29-28(b) ...................................................... 30

Del. Code Ann. § 1441(a)(3) ..................................................... 29

Idaho Code § 18-3302k(4) ........................................................ 30

Ill. Comp. Stat. Ann. §§ 66/25 ................................................. 29

Ill. Comp. Stat. Ann. § 66/75 ................................................... 29

Iowa Code § 724.9 .................................................................... 30

Kan. Stat. Ann. § 75-7C,04(b)(1) ............................................ 30

Ky. Rev. Stat. § 237.110(4)(i) ................................................... 31

La. Rev. Stat. § 40:1379.3(D) ................................................... 31

Maine Rev. Stat. § 2003(1)(E)(5) ............................................. 31

Md. Code Ann., Pub. Safety § 5-117.1, and 16 ....................... 29

Md. Code Ann., Pub. Safety § 5-306(a)(5) .............................. 30

Mich. Comp. Laws Serv. § 28.425j(1) ..................................... 30

Minn. Stat. § 624.714, subd. 2a .............................................. 31

Mo. Rev. Stat. §§ 571.101(2)(10), 571.111 ............................. 30

Mont. Code Ann. § 45-8-321(3) ............................................... 31

N.C. Gen. Stat. § 14-415.12(a)(4) ........................................... 31

N.M. Stat. Ann. §§ 29-19-4 & 29-19-7 ................................... 30

N.Y. Penal L. § 400.00 *et seq*. (CCIA) ............................... *passim*

v

# TABLE OF AUTHORITIES (cont'd)

**Page(s)**

Nev. Rev. Stat. § 202.3657(3)(c) ................................................... 31

N.Y. Penal Law § 400.00(1) ...................................................... 5, 8

N.Y. Penal Law § 400.00(3) .......................................................... 8

N.Y. Penal Law § 400.00(19) .............................................. 7, 20, 21

38 RCNY §§ 5-12 ................................................................... 6, 27

Ohio Rev. Code § 2923.125(A)(3), (G) .................................... 30

Or. Rev. Stat. Ann. § 166.291(1)(f) ......................................... 31

R.I. Gen. Laws Section 11-47-15 .............................................. 31

S.C. Code Ann. §§ 23-31-215(A)(5), -210(4) ........................... 31

Tenn. Code Ann. § 39-17-1366(b)(4)(A)(vii), (j)(3) ................ 31

Va. Code Ann. § 18.2-308.02 ................................................... 31

W.Va. Code § 61-7-4(b)(11), (e) ............................................. 31

Wis. Stat. Ann. § 175.60(3)(g), (4)(a)(1) ................................ 31

Women's Armed Services Integration Act of 1948, Pub. L.
  No. 80-625, 62 Stat. 368 (1948) .......................................... 37

Wyo. Stat. Ann. § 6-8-104(b)(vii) .......................................... 31

## Other Authorities

New York State Division of Criminal Justice Services,
  *Minimum Standards for New York State Concealed Carry
  Firearm Safety Training* (Aug. 23, 2022),
  https://perma.cc/35ZH-FBLD ............................... 7, 20, 27, 28

vi

## TABLE OF AUTHORITIES (cont'd)

**Page(s)**

New York State Division of Criminal Justice Services,
*Frequently Asked Questions Regarding Recent Changes to
New York Firearm Laws*, (Aug. 27, 2022),
https://perma.cc/68G3-C3KK.................................................................. 7

City Record, vol. CXLIX, no. 200, at 5130 (Oct. 18, 2022),
https://www.nyc.gov/assets/dcas/downloads/pdf/cityrecord/
cityrecord-10-18-22.pdf ........................................................................ 6

City Record, vol. CXLIX, no. 240, at 6129 (Sept. 16, 2022),
https://www.nyc.gov/assets/dcas/downloads/pdf/cityrecord/
cityrecord-12-16-22.pdf ........................................................................ 6

NYPD Website, Training Bureau, https://perma.cc/K9TC-
JD3W .................................................................................................... 22

NYPD Website, Training: Firearms and Tactics,
https://perma.cc/97MQ-VALL............................................................... 22

## PRELIMINARY STATEMENT

Plaintiff-appellant Jonathan Corbett appeals from the denial of a preliminary injunction that would block New York's training requirement for issuance of licenses to carry concealed firearms—a component of the State's Concealed Carry Improvement Act (CCIA) that was enacted after the Supreme Court held that its "proper cause" requirement for licensure violated the Second Amendment.

Corbett brought this facial challenge under the Second Amendment to several provisions of the CCIA, including, as relevant to this appeal, one that requires him to complete an 18-hour firearm-safety course or—as implemented by the State and the City of New York—show that he obtained training that is deemed comparable in the five years before the law went into effect. Rather than complete his application for licensure, Corbett sought a preliminary injunction against enforcement of the training requirement by the State or the City. The U.S. District Court for the Southern District of New York (Schofield, J.) denied the motion.

This Court should affirm because Corbett lacks standing to challenge the CCIA's training requirement. He has not established a cognizable injury-in-fact because he has not been denied a license and

cannot show that completing his application would be futile. His application is still pending because he refuses to complete it by supplying the NYPD License Division with information relating to his training experience and other, unrelated documentation.

Alternatively, this Court should affirm because, as the district court correctly held, Corbett would not be entitled to a preliminary injunction in any event. He is unlikely to prevail on the merits of his challenge for multiple reasons. He does not dispute that a training requirement is permissible under the Second Amendment; he objects only to the purported stringency of New York's requirement. But to prevail on a facial challenge, he must show that the law is unconstitutionally burdensome in every application. He cannot do so since the requirement can be met in some instances with training that an applicant has already completed. In any event, the Supreme Court has already endorsed as constitutional dozens of states' shall-issue firearms-licensing laws with comparable training requirements.

As the Supreme Court's treatment of shall-issue licensure laws shows, and Corbett has conceded, requiring people who carry firearms to be trained in their safe and effective use is constitutional under the

Second Amendment. No further or more particularized historical inquiry is needed. In any event, New York's measure is consistent with the Nation's historical tradition of firearms regulations, such as Founding-era laws barring irresponsible individuals from carrying firearms, and is far less burdensome than the Founding-era's mandatory militia-training laws.

The other preliminary-injunction factors also weigh against injunctive relief. On one side of the scale, an injunction would not avert immediate injury because Corbett's application is incomplete in other respects. Any interest that Corbett may have in circumventing the training requirement is readily outweighed by the State's and City's compelling interest in preventing untrained individuals from carrying firearms and in avoiding disruption and confusion among licensing officers, applicants, and training providers during the early days of implementing a new regulatory regime. Licensing officers would have to adopt new protocols, only to have to expend additional time and resources restoring the training requirement—including by potentially rolling back issued licenses—if the CCIA is upheld on final judgment. The public and private interests all tip decidedly against a preliminary injunction.

3

## ISSUES PRESENTED FOR REVIEW

1.      Did Corbett fail to establish a cognizable injury-in-fact, where he neither applied for and was denied a concealed-carry permit, nor showed that completing his application would be futile?

2.      Alternatively, did the district court providently deny Corbett's motion for a preliminary injunction, where he failed to show that he was likely to succeed on the merits and where the other preliminary-injunction factors weigh against an injunction?

## STATEMENT OF THE CASE

### A.  Legal background culminating in the adoption of the CCIA

In June 2022, in *New York State Rifle & Pistol Association v. Bruen*, 142 S. Ct. 2111 (2022)*,* the Supreme Court invalidated the "proper cause" requirement set forth in the Sullivan Law, which had governed concealed-carry licensing in New York State for over a century. *Id.* at 2156. In response, Governor Kathy Hochul immediately called a special legislative session, and, on July 1, 2022, the New York State Legislature enacted the Concealed Carry Improvement Act (S.51001/A.41001).

The CCIA, which became effective September 1, 2022, establishes new statewide standards for issuing carry licenses and regulating

firearms more generally. *See* 2022 N.Y. Laws ch. 371; N.Y. Penal L. § 400.00 *et seq*. Among other things, the CCIA requires applicants who submit initial or renewal applications after September 1 to disclose their social-media handles and provide character references. This provision does not apply to Jonathan Corbett, the plaintiff-appellant here, because he had a pending concealed carry application before September.

The CCIA also adds a new subsection 19 to New York Penal Law § 400.00(1), that applies to all licenses issued after September 1, regardless of whether the underlying application was pending beforehand. Subsection 19 imposes a new training requirement: all license holders must complete 18 hours of training, consisting of 16 hours of "in-person live curriculum" and 2 hours of "live-fire range training." The training course must cover "(i) general firearm safety; (ii) safe storage requirements and general secure storage best practices; (iii) state and federal gun laws; (iv) situational awareness; (v) conflict de-escalation; (vi) best practices when encountering law enforcement; (vii) the statutorily defined sensitive places …; (viii) conflict management; (ix) use of deadly force; (x) suicide prevention; and (xi) the basic principles of marksmanship." The requirement applies to Corbett.

5

NYPD initially promulgated emergency regulations to ensure that pending and recently denied license applications were "evaluated consistent with the Supreme Court's ruling in *Bruen*, while also maintaining a licensing scheme that preserves public safety within the city." City Record, vol. CXLIX, no. 200, at 5130 (Oct. 18, 2022).[1] A month later, NYPD promulgated an updated set of permanent licensing regulations that conform to *Bruen* and the new state legislation. City Record, vol. CXLIX, no. 240, at 6129-41 (Dec. 16, 2022).[2] One of the new regulations applies to "pending applications filed on or before August 31, 2022," and requires applicants to submit a "statement indicating that the applicant has been trained or will receive training in the use and safety of a handgun" and to complete such training before the license is issued. *Id.* at 6133; 38 RCNY §§ 5-12(a)(2)(iii), (4).

The New York State Division of Criminal Justice Services (DCJS) has issued written guidance on the CCIA's training requirements. The

---

[1] The Joint Appendix omits the City Defendants' Declaration and supporting exhibits submitted in opposition to Corbett's motion for a preliminary injunction. The City Register from October 18 is available on the district court's electronic docket, SDNY Case. No. 22-cv-5867, ECF No. 64-5, and also, online, https://www.nyc.gov/assets/dcas/downloads/pdf/cityrecord/cityrecord-10-18-22.pdf.

[2] City Record, vol. CXLIX, no. 240, at 6129 (Sept. 16, 2022), https://www.nyc.gov/assets/dcas/downloads/pdf/cityrecord/cityrecord-12-16-22.pdf.

6

guidance, entitled "Minimum Standards for New York State Concealed Carry Firearm Safety Training" and issued in August 2022, states that for applicants "who have completed a firearm safety training course within the five years preceding September 1, 2022, the respective licensing officer may give credit for such prior training to satisfy some or all of the training requirements set forth in New York Penal Law § 400.00(19), as the licensing officer deems appropriate." A second guidance document, addressing "Frequently Asked Questions Regarding Recent Changes to New York Firearm Laws" explains that "[l]ocal licensing officers have the discretion to determine whether a portion or all of the firearms training requirement is satisfied for those applicants who completed a firearm safety course in the previous 5 years."[3]

---

[3] The State's guidance and FAQ were attached as exhibits to the City Defendants' Declaration and can be found on the district court's electronic docket as SDNY Case. No. 22-cv-5867, ECF Nos. 64-2 and 64-3, respectively, and online, at https://perma.cc/35ZH-FBLD, and, https://perma.cc/68G3-C3KK, respectively.

**B. Corbett's pending concealed carry application, and his challenge to the training requirement and other provisions of the CCIA**

In April 2022, before the Supreme Court's decision in *Bruen* and the enactment of the CCIA, Corbett applied to the NYPD's License Division for a license to carry a concealed firearm (Joint Appendix ("JA") 5).

After the CCIA's enactment, Corbett sued state officials, challenging on their face the CCIA's new requirements to disclose social-media handles and provide character references as part of a license application on First and Second Amendment grounds, and challenging the new training requirement under the Second Amendment. On appeal, he explicitly abandons his challenge to the social-media and character-reference requirements because they do not apply to him and the district court found that he lacked standing to challenge them (Appellant's Brief ("App. Br.") 7; JA 236-37).

Corbett filed an amended complaint adding as defendants several New York City officials, including NYPD's police commissioner, who is the "licensing official" charged with reviewing applications and issuing concealed carry licenses in New York City under New York Penal Law § 400.00(1), (3). *See id.* § 265.00(10).

8

In the meantime, Corbett's application is still pending before NYPD. As of the date of this brief, review of the application is stalled because Corbett has refused to provide the License Division with requested documentation unrelated to CCIA's training requirement, as well as the required statement about his firearms training history.

## C. The district court's denial of Corbett's motion for a preliminary injunction

With his complaint, Corbett filed a motion for a preliminary injunction. He asked the court to enjoin enforcement of the new requirements that applicants disclose their social-media handles and provide character references, and the "pre-licensure or pre-renewal training" requirement, and to direct the City defendants "to cease enforcement of these provisions and to continue processing applications for gun licenses as if these sections were not present, until further order of the Court" (JA29).

The district court (Schofield, J.) denied that motion on the record, after oral argument (JA214-44). The court concluded that, with respect to the social-media-handle disclosure and character-reference requirements, he is unlikely to succeed on the merits because he lacks

9

standing (JA236-37). With respect to the CCIA's training component, the court found that he failed to demonstrate a likelihood of success on the merits (JA235-41; *see also* SDNY Case No. 22-cv-5867, ECF No. 74). The court "assum[ed] without deciding that he is likely to able to show that has standing" (JA237-38), but concluded that, while "the Second Amendment's plain text covers the conduct in question … the training requirement is consistent with the Nation's historical tradition of firearm regulation" (JA239). The court found that militia laws from the Founding-era were analogous to the training requirement and were at least as burdensome as the CCIA's training requirement (JA239-40).

Corbett now appeals the denial of a preliminary injunction, as limited by his brief. The case otherwise remains pending below.

## SUMMARY OF ARGUMENT
## AND STANDARD OF REVIEW

The decision whether to issue a preliminary injunction is entrusted to the sound discretion of the district court, and this Court reviews its determination for abuse of discretion, except that it assesses *de novo* whether the district court made errors of law. *Agudath Israel of Am. v. Cuomo*, 983 F.3d 620, 631 (2d Cir. 2020). Applying this standard, this

Court should affirm the denial of Corbett's motion for a preliminary injunction.

*First*, Corbett lacks standing to challenge the CCIA's training requirement—the sole provision of the statute that he addresses on appeal. His concealed-carry application has not been denied for failure to meet that requirement; it has not been denied at all, because Corbett has refused to complete it. Settled law holds that an applicant for a license does not have a cognizable injury-in-fact sufficient to confer standing to challenge a licensing regime unless their application has been denied or they can show that applying would be futile. Corbett's application has not been denied, and his pleadings and evidentiary submissions in support of his motion do not sufficiently establish futility. This Court's review need go no further.

*Second*, and in any event, the district court correctly denied Corbett's application for a preliminary injunction independently of the standing problem. As the court held, Corbett is unlikely to succeed on the merits. And the other factors also do not support injunctive relief.

Corbett does not dispute that some training requirements are consistent with the Second Amendment; rather, he asserts only that the

11

CCIA's training requirement is too burdensome. His facial challenge fails at the threshold, however, since DCJS and the License Division recognize that an applicant may be able to meet the training requirement, in whole or in part, with other forms of training obtained before its effective date. Since the training requirement may impose no burden on some applicants, potentially including Corbett himself, his facial challenge necessarily fails.

In any event, *Bruen* confirms that the training requirement comports with the Second Amendment. The Supreme Court emphasized in *Bruen* that the numerous state shall-issue firearm-licensing regimes do not violate the Second Amendment. The Court specifically noted that these regimes often contain training requirements, and indeed many of them impose training requirements comparable to the CCIA's. This Court therefore need not undertake its own Second Amendment analysis to hold that the CCIA's training requirement is constitutional.

If the Court chooses to re-derive *Bruen*'s endorsement of training requirements using *Bruen*'s analytical framework, it should conclude that the CCIA's training requirement is constitutional. *Bruen* teaches that further historical scrutiny is not needed to sustain threshold

application requirements that help to ensure that only persons within the scope of the right—that is, law-abiding, responsible individuals—carry firearms. The Court may thus uphold the training requirement at *Bruen*'s first step.

The training requirement would also satisfy *Bruen*'s history-and-tradition analysis, if it were necessary. As noted, Corbett has conceded that some training requirement is constitutionally permissible. *Bruen* does not support his demand that the government identify historical laws that justify the exact number of hours of training that the CCIA requires, since *Bruen* expressly disclaims any requirement to show "a historical twin" in order to sustain a modern law. In any event, the CCIA's requirement is consistent with the Nation's longstanding tradition of ensuring that only law-abiding, responsible individuals carry firearms, including through mandatory training. This tradition is reflected in, among other things, the Founding-era laws disarming certain individuals and requiring training with firearms as part of militia service.

Moreover, although the district court did not reach the other preliminary-injunction factors, those factors also weigh against issuing the requested relief. The injunction that Corbett seeks would not avert

any immediate harm during the pendency of litigation or preserve the district court's ability to later craft meaningful relief because Corbett's license application would not automatically be granted—it is still incomplete, and not just for lack of proof of sufficient training.

The injunction that Corbett seeks, meanwhile, is overbroad and would prohibit consideration of any training experience, for all applicants—even those with no training whatsoever—even though Corbett conceded below that a less exacting training requirement would be lawful. Such an injunction would harm the public interest by dispensing with a rule, enacted as part of the democratic process, that is designed to ensure that only competent individuals publicly carry firearms. The result may be the very sort of accidents and deaths that the law is crafted to prevent. And from an administrative perspective, an injunction would be disruptive and impose unnecessary costs on licensing officers and training providers, and cause confusion about the requirements for licensure. Those effects would only be exacerbated if, at conclusion of the litigation, the training requirement is held to pass constitutional muster, and any interim changes have to be rolled back.

14

Thus, considering Corbett's failure to meet his burden on all prongs of the preliminary-injunction standard, the Court should affirm the district court's denial of his motion for a preliminary injunction if the Court finds he has standing to pursue this case.

## ARGUMENT

### POINT I

### CORBETT LACKS STANDING BECAUSE HIS APPLICATION HAS NOT BEEN DENIED

Corbett has not alleged facts that establish standing to pursue this case, including at the preliminary injunction stage. His allegation of a concrete injury boils down to speculation about how the Licensing Division would act on his application if he were to complete it. Because he hasn't been denied a license or demonstrated that completing his application would be futile, he hasn't shown a concrete injury sufficient for standing.

Standing is a threshold question of subject-matter jurisdiction that must be resolved. *Jackson-Bey v. Hanslmaier*, 115 F.3d 1091, 1095 (2d Cir. 1997). The district court "assum[ed] without deciding" that Corbett has standing (JA237), but should have answered the question, *see Miller v. Metro. Life Ins. Co.*, 979 F.3d 118, 124 (2d Cir. 2020) (Menashi, J.,

15

concurring in judgment) (noting that "[t]he Supreme Court has rejected the practice of assuming jurisdiction for the purpose of deciding the merits—the doctrine of hypothetical jurisdiction—because it carries the courts beyond the bounds of authorized judicial action and thus offends fundamental principles of separation of powers" (cleaned up)).[4] Corbett has not established standing to challenge the training requirement.

To meet the "constitutional minima" of standing, Corbett was required to show (1) an injury in fact that is concrete, particularized, and actual or imminent; (2) that was likely caused by the defendant; and (3) that is redressable through the litigation. *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2203 (2021). Nowhere in Corbett's pleadings does he allege an actual or imminent injury caused by the Licensing Division's implementation of the CCIA's training requirement.

Generally, a cognizable injury-in-fact does not arise from a governmental licensing regulation until a license application has been denied, unless awaiting denial would be futile. *See Jackson-Bey*, 115 F.3d at 1096 (collecting cases). As this Court recently put it, "[i]n order to

---

[4] This brief uses "cleaned up" to indicate that internal quotation marks, alterations, or citations have been omitted from quotations.

16

challenge the New York firearm licensing laws, a person must either have applied for and been denied a license or make a substantial showing that his or her application would have been futile." *Libertarian Party v. Cuomo*, 970 F.3d 106, 116, 121-22 (2d Cir. 2020) (cleaned up).

This Court has recognized an exception to the denial-or-futility rule where a plaintiff advances a facial constitutional challenge to having to submit to a licensing scheme in the first place. *Brokamp v. James*, 66 F.4th 374, 2023 U.S. App. LEXIS 10343 (2d Cir. 2023). In *Brokamp*, an out-of-state psychotherapist challenged on free speech grounds the State's requirement that mental-health counselors be licensed. Her theory was that any licensing of counseling was impermissible because "talk therapy is speech" in which individuals are "constitutionally entitled to engage without state limitation or license," so having to apply at all was an injury-in-fact. 2023 U.S. App. LEXIS 10343 at *18. This Court explained that, by contrast, "an application requirement is apt when a party complains that he is being denied a benefit that is not itself constitutionally guaranteed … for unconstitutional (or other unlawful) reasons." *Id.*

17

Corbett does not challenge as unconstitutional the baseline requirement to obtain a license before carrying a concealed firearm in New York City. Nor could he. *Bruen* confirms that states may constitutionally require a license to carry a concealed carry handgun. *See* 142 S. Ct. at 2138 n.9 ("[N]othing in our analysis should be interpreted to suggest the unconstitutionality of the 43 States' 'shall-issue' licensing regimes."); *id*. at 2161 (Kavanaugh, J., concurring) ("[T]he Court's decision does not prohibit States from imposing licensing requirements for carrying a handgun for self-defense."). Because his challenge is not to the requirement that he obtain a license at all, the *Brokamp* exception does not apply.

Rather, Corbett's challenge is just like the scenario contemplated in *Brokamp* and presented in *Libertarian Party* to which the denial-or-futility rule applies. To obtain a license, Corbett must complete an 18-hour course or identify relevant experience from the five years preceding the CCIA's effective date. Corbett complains that the requirement is so burdensome that it deprives him of a license for unconstitutional reasons (App. Br. 9). Thus, just as in *Libertarian Party*, to show an injury-in-fact

18

caused by the firearms licensing law, he must either have been denied a license or demonstrate futility.

He can show neither. There is no dispute that his application has not been denied; his own inaction has prevented the License Division from completing its review of his application and granting or denying it.

Nor has Corbett demonstrated that completing his application would be futile.[5] Futility is a high bar; the requirement that a plaintiff must submit to the challenged policy "may be excused only where a plaintiff makes a *substantial showing* that application … would have been futile." *Jackson-Bey*, 115 F.3d at 1096 (emphasis added). Thus, a handgun-license applicant may establish futility by showing they are "statutorily ineligible for a carry license." *Bach v. Pataki*, 408 F.3d 75, 82-83 (2d Cir. 2005). But applicants cannot decide for themselves that their applications would be denied to manufacture a concrete injury. *United States v. Decastro*, 682 F.3d 160, 164 (2d Cir. 2012). Thus, this Court held that the plaintiffs in *Libertarian Party*—who challenged the good-moral-character, proper-cause, and good-cause requirements in

---

[5] The district court's conclusion that the futility exception might apply (JA221, 237-38) was error.

19

New York's since-amended licensing scheme, as well as the scheme as a whole—lacked standing because they had not applied for a license. 970 F.3d at 121.

Corbett has not made a substantial showing that completing his application would be futile. While he affirms that he does "not intend to waste another 18 hours of [his] life taking New York training courses" (SDNY Case No. 22-cv-5867, ECF No. 49 at 2), nothing in *Libertarian Party* suggests that he can simply declare his application futile on that basis. Perhaps more significantly, his factual premise is mistaken: Corbett is not required to take "New York training courses" because DCJS's guidance provides that, for applicants "who have completed a firearm safety training course within the five years preceding September 1, 2022, the respective licensing officer may give credit for such prior training to satisfy some or all of the training requirements set forth in New York Penal Law § 400.00(19), as the licensing officer deems appropriate."[6] The NYPD Licensing Division thus has discretion to

---

[6] https://perma.cc/35ZH-FBLD

consider formal and informal safety and live-fire training completed outside of New York after September 1, 2017.

In light of this flexibility, Corbett has plainly failed to show futility. He tried to address this problem in a reply affirmation below, stating that "[w]hile [he has] taken a gun training course, it was completed more than 5 years ago"—as of the October 28, 2022 date on which he filed the reply affirmation (*id.*, ECF No. 68 at 1). But the affirmation covers the wrong time frame: the relevant date is five years before the CCIA's effective date—or September 1, 2017. Corbett's reply affidavit instead speaks to the period after October 28, 2017 and makes no representation at all about "gun training course[s]" he may have taken between September 1 and October 28, 2017.

Even if it covered the correct time period, Corbett's reply affirmation would remain insufficient to meet the high bar of showing futility under *Libertarian Party*. Corbett has simply taken it upon himself to decide what would constitute relevant training for the purpose of the statute. But it is for the licensing officer to apply that standard in the first instance. It is not for Corbett to assume how a licensing officer would use the flexibility granted by DCJS when reviewing his experience.

He has not disclosed whether he participated in any other type of formal or informal training, other than a "gun training course" as he defines the term, that relates to safety or live-firing in the five-year window and that the Licensing Division might be able to consider in lieu of some or all of the required in-state 18-hour training course (JA219-20).

Indeed, Corbett's own representations about his expertise with firearms suggest that there may be a basis for the licensing officer to determine that he does have at least some qualifying experience. He stated that he has been licensed by the State of Florida to carry a handgun since 2009 and has regularly visited handgun ranges (JA190). And he affirmed in support of his motion for a preliminary injunction that he "already completed law school and substantial firearms training out-of-state, and likely ha[s] more target practice time than the average New York City Police Officer" (SDNY Case No. 22-cv-5867, ECF No. 49 at 2).[7] Given Corbett's purportedly extensive experience, he has failed to demonstrate that it would be futile to disclose his experience with

---

[7] NYPD officers must complete, at a minimum, 15 days of firearms training, including five days of basic firearms instruction and ten days of tactical training. *See* NYPD Website, Training: Firearms and Tactics, https://perma.cc/97MQ-VALL. Officers also receive ongoing training throughout their careers. *See* NYPD Website, Training Bureau, https://perma.cc/K9TC-JD3W.

firearms during the five-year lookback period to the License Division, to allow the agency to exercise its discretion to determine whether he has met all or some of the training requirement.[8]

Having failed to demonstrate either that his concealed carry license application was denied, or that completing his application would be futile, Corbett does not have a cognizable injury-in-fact, and so lacks standing. He cannot do an end-run around standing to secure an advisory opinion from this Court that the CCIA's training requirement, on its face, is too exacting, when the rule might not prevent him from securing a license.

## POINT II

## THE DISTRICT COURT CORRECTLY DENIED A PRELIMINARY INJUNCTION

Apart from standing, the district court correctly held that Corbett was not entitled to a preliminary injunction against enforcement of the CCIA's training requirement. A preliminary injunction is an

---

[8] Where Corbett's constitutional objection is solely to the degree of burden presented by the training requirement, even a finding by the licensing officer that Corbett's experience satisfies some portion of the training requirement—for example, the live-fire component—may well alter the claim's framing. Even apart from its relevance to standing, the indeterminacy of the training requirement's impact on Corbett may be reason alone to hold that he has not made a sufficient showing to obtain a preliminary injunction.

23

"extraordinary and drastic remedy" that is "never awarded as of right." *Munaf v. Geren*, 553 U.S. 674, 689-90 (2008). The purpose of such an injunction "is not to award the movant the ultimate relief sought in the suit but is only to preserve the status quo by preventing during the pendency of the suit the occurrence of that irreparable sort of harm which the movant fears will occur." *Kane v. De Blasio*, 19 F.4th 152, 163 (2d Cir. 2021) (cleaned up). Because it aims to prevent irreparable injury and protect the court's ability to render a "meaningful" final decision, entry of a preliminary injunction "is an exercise of discretion and judgment, often dependent as much on the equities of a given case as the substance of the legal issues it presents." *Id*. (cleaned up).

To obtain a preliminary injunction that "will affect government action taken in the public interest pursuant to a statute or regulatory scheme, the moving party must demonstrate (1) irreparable harm absent injunctive relief, (2) a likelihood of success on the merits, and (3) public interest weighing in favor of granting the injunction." *We the Patriots USA, Inc. v. Hochul*, 17 F.4th 266, 279-80 (2d Cir. 2021) (quoting *Agudath*, 983 F.3d at 631). Corbett failed to make a sufficient showing on any of these prongs. As the district court determined, Corbett has not

24

shown a likelihood of success on the merits of his Second Amendment challenge. And the remaining factors, which the court did not reach, also strongly counsel against the imposition of injunctive relief.

## A. Corbett is not likely to succeed on the merits.

Corbett cannot succeed on the merits, both because the Supreme Court has expressly endorsed training requirements like the CCIA's and because, in any event, the training requirement would satisfy Second Amendment scrutiny.

### 1. *Bruen* forecloses Corbett's theory that the CCIA's training requirement is too exacting.

The Supreme Court's decision in *Bruen* answers the question posed by this case. In *Bruen*, the Court held that, to be valid, a restriction on the right to carry a concealed firearm must be "consistent with this Nation's historical tradition of firearm regulation." 142 S. Ct. at 2126. But the Court made clear that "nothing in [its] analysis should be interpreted to suggest the unconstitutionality of the 43 States' 'shall-issue' licensing regimes … which often require applicants to undergo a background check or *pass a firearms safety course* … to ensure … that

those bearing arms in the jurisdiction are, in fact, 'law-abiding, *responsible* citizens.'" *Id.* at 2138 n.9 (emphasis added).

In his concurrence, Justice Kavanaugh emphasized that, while "open-ended," "unchanneled discretion for licensing officials" is not supported by the Nation's historical tradition, the Court's invalidation of New York's "proper-cause" requirement did not affect the "43 States that employ objective shall-issue licensing regimes," which "may require a license applicant to undergo fingerprinting, a background check, a mental health records check, and *training in firearms handling and in laws regarding the use of force*, among other possible requirements." *Id.* at 2161 (Kavanaugh, J., concurring) (emphasis added).

*Bruen* explained that requiring licensees to meet *objective* standards, including satisfying training criteria, as part of a shall-issue regime is consistent with the longstanding American tradition of limiting the carrying of firearms to "law-abiding, responsible citizens." *Id.* at 2138 n.9. Licensing officials use mandatory training to ensure that applicants are sufficiently law-abiding and responsible to keep and bear arms, and in so doing, don't interfere with the right's exercise.

26

Indeed, during oral argument before the district court, Corbett admitted as much, stating that he did not "dispute that a training requirement of some kind is Constitutional …; the question is whether or not they're excessive" (JA232). As articulated on appeal, he contends that a requirement to complete a 16-hour instructional course and two hours of live-fire training is so onerous that it is facially unconstitutional (*see* App. Br. 9).

The first problem with this argument is that it focuses on only one path to satisfying the training requirement. Both DCJS and the License Division have signaled that the requirement can be met, at least for some applicants, without completing any additional instructional course or additional live-fire training, because licensing officers have flexibility to construe experience obtained since September 2017 as training that can satisfy some or all of the requirement. *See* https://perma.cc/35ZH-FBLD; 38 RCNY §§ 5-12. Corbett makes no argument that the more flexible path to licensure offered by the agencies' guidance would be overly burdensome. That omission dooms his facial challenge since he has not shown that all applications of the training requirement are unconstitutional. *See Copeland v. Vance*, 893 F.3d 101, 111 (2d Cir. 2018)

27

("A facial challenge is the most difficult challenge to mount successfully because, as a general matter, the challenger must establish that no set of circumstances exists under which the Act would be valid." (cleaned up)). Indeed, as shown above, Corbett has not even demonstrated that the requirement presents any burden at all for him personally. Even if his previous training was not deemed to fulfill the CCIA's entire requirement, the agency has discretion to find that *some* of the requirement is satisfied, potentially reducing his outstanding balance of required training hours below whatever unspecified number of hours he believes is so burdensome that it offends the Second Amendment.[9]

In any event, Corbett could not show that 18 hours of training is too burdensome. Indeed, the *Bruen* Court explicitly approved similar requirements. And, notably, when blessing the licensing regimes in 43 states, *Bruen* did not inquire into the nuanced differences between those 43 regulatory schemes. Instead, the Court evidently accepted that there are a range of ways in which state and local jurisdictions conduct their application processes, all of which fall under the umbrella of permissible

---

[9] https://perma.cc/35ZH-FBLD.

shall-issue schemes—implicitly finding that these variations are constitutionally acceptable. *See Bruen*, 142 S. Ct. at 2162 (Kavanaugh, J., concurring) ("[T]he Second Amendment … allows a variety of gun regulations ….").

Among shall-issue regimes the Court cited as consistent with the Second Amendment were several featuring permutations of training requirements that are comparable to the CCIA's, even ignoring the alternative pathway available to qualify based on past training. For instance, Illinois requires applicants to receive 16 hours of training from a certified instructor, plus compete a live-fire exercise supervised by a certified instructor, 430 Ill. Comp. Stat. Ann. §§ 66/25, 66/75. The curriculum must cover firearms safety, marksmanship, care, cleaning, loading, and unloading of a concealable firearm, applicable state and federal law on ownership, storage, carry, and transportation, and instruction on appropriate interaction with law enforcement when transporting or carrying a concealed firearm. 430 Ill. Comp. Stat. Ann. § 66/75. Maryland requires completion of at least four hours of instruction just to purchase a firearm, Md. Code Ann., Pub. Safety § 5-117.1, and 16 hours of instruction to qualify for a license to carry a

concealed handgun, which includes instruction on firearm law, safety, and handgun mechanisms and operation, Md. Code Ann., Pub. Safety § 5-306(a)(5).[10] New Mexico similarly requires applicants to complete an approved firearms training course, which must be at least 15 hours long and cover a set curriculum, and to take a two-hour "refresher firearms training course" within two years of receiving their original or renewed license. N.M. Stat. Ann. §§ 29-19-4 & 29-19-7. Comparable substantive training requirements are imposed by many other shall-issue regimes discussed with approval in *Bruen*.[11]

---

[10] Other states also set out a detailed curriculum. Delaware, for instance, requires completion of an approved course that covers instruction about knowledge and safe handling of firearms and ammunition, safe storage of firearms and ammunition, child safety, shooting fundamentals, ways to develop and maintain firearm shooting skills, "federal and state laws pertaining to the lawful purchase, ownership, transportation, use and possession of firearms," "the laws of this State pertaining to the use of deadly force for self-defense," and "techniques for avoiding a criminal attack and how to manage a violent confrontation, including conflict resolution," and also includes a live-firing component consisting of "exercises conducted on a range, including the expenditure of a minimum of 100 rounds of ammunition." 11 Del. Code Ann. § 1441(a)(3).

[11] Many states require applicants to complete at least an eight-hour course. Alaska Stat. §§ 18.65.705(6) & .715; 3 Alaska Admin. Code § 30.070 (requiring completion an approved course, at least 12 hours long, such as the NRA's basic personal protection course); Idaho Code § 18-3302k(4); Kan. Stat. Ann. § 75-7C,04(b)(1); Mich. Comp. Laws Serv. § 28.425j(1); Mo. Rev. Stat. §§ 571.101(2)(10), 571.111; Ohio Rev. Code § 2923.125(A)(3), (G). Others do not specify a minimum length for training, but require completion of a state-approved training program such as the NRA's eight-hour basic safety training, or training offered by a local law enforcement agency. Conn. Gen. Stat. § 29-28(b); Ark. Stat. § 5-73-309(13); Iowa Code § 724.9; La. Rev.

*(cont'd on next page)*

The Supreme Court's endorsement of these various training requirements—without a detailed review of the laws' many nuances—reflects that the "reasonable, well-defined" steps required for licensure designed to ensure that firearms remain in the hands of law-abiding, responsible individuals would not generally trigger Second Amendment scrutiny on their face. *Bruen*, 142 S. Ct. at 2156. Thus, the CCIA's training requirement—as a regulation comparable to those contained in the shall-issue regimes already approved by the Supreme Court—is facially valid.

To be sure, *Bruen* leaves a path open for challenging such licensing steps. The decision did "not rule out constitutional challenges to shall-

---

Stat. § 40:1379.3(D) (completion of any NRA course in the previous 12 months, or a law-enforcement related course or training); Ky. Rev. Stat. § 237.110(4)(i); Minn. Stat. § 624.714, subd. 2a; Nev. Rev. Stat. § 202.3657(3)(c); N.C. Gen. Stat. § 14-415.12(a)(4); 21 Okla. Stat. Ann. § 1290.12(A)(2); S.C. Code Ann. §§ 23-31-215(A)(5), -210(4); W.Va. Code § 61-7-4(b)(11), (e); Wis. Stat. Ann. § 175.60(3)(g), (4)(a)(1); Wyo. Stat. Ann. § 6-8-104(b)(vii); *see also* Tenn. Code Ann. § 39-17-1366(b)(4)(A)(vii), (j)(3) (requiring completion of certified training of no less than 90 minutes). Yet others with training requirements will accept proof of training from a certified instructor, but also accept alternative ways to demonstrate competence with firearms. *E.g.*, 25 Maine Rev. Stat. § 2003(1)(E)(5) (through examination); Mont. Code Ann. § 45-8-321(3) (through training or possession of a license in another state or political subdivision that has a training or testing requirement); Ariz. Stat. § 13-3112(E)(6), (N) (same); Va. Code Ann. § 18.2-308.02 (same); Colo. Stat. § 18-12-203(1)(h)(I), (VI) (through participation in shooting competitions or training); Or. Rev. Stat. Ann. § 166.291(1)(f) (same); *see also* R.I. Gen. Laws Section 11-47-15 (requiring applicants to demonstrate proficiency though a pistol-instructor certification).

31

issue regimes where, for example, lengthy wait times in processing license applications or exorbitant fees deny ordinary citizens their right to public carry." 142 S. Ct. at 2138 n.9. But Corbett does not challenge the training requirement on this basis. Indeed, he is not making any sort of as-applied challenge. Anyway, he could not show that the training requirement is being put to abusive ends to deny his application because he did not bother to complete his application.[12]

### 2. CCIA's training requirement is consistent with the Second Amendment under *Bruen*'s framework.

Although it's unnecessary for this Court to undertake its own analysis of the CCIA's training requirement in light of *Bruen*'s express approval of licensing schemes with comparable requirements, if this Court chooses to do so, it should hold that the requirement survives Second Amendment scrutiny for three reasons.

First, Corbett's claim fails at step one of *Bruen*'s framework. *Bruen*'s analysis begins by asking whether "the Second Amendment's

---

[12] To the extent that Corbett argued below that the training requirement was too financially burdensome or caused a delay in the processing of his application, he has abandoned those arguments on appeal, limiting his arguments to challenging the CCIA's training requirement's historical provenance (*see* App. Br. 10-13).

plain text covers an individual's conduct." 142 S. Ct. at 2126. This inquiry considers, as relevant here, whether the individual is "part of 'the people' whom the Second Amendment protects." *Id.* at 2134. *Bruen* approved of the shall-issue licensing regimes without historical examination; their requirements are "designed to ensure only that those bearing arms in the jurisdiction are, in fact, law-abiding, responsible citizens," *id.* at 2138 n.9, that the Second Amendment protects.

Threshold application requirements that do not disqualify an applicant based on some personal characteristic, but simply impose a step that an applicant must take to obtain a license—like providing fingerprints, disclosing residences, notarizing a signature, or completing a basic course in firearm safety and use, as is required by the CCIA—aid the government in its threshold task of ensuring that each applicant is a law-abiding, responsible individual who falls within the Second Amendment's protection. These measures have no Second Amendment valence of their own, where they do not prevent law-abiding, responsible persons from carrying firearms.

Second, even if the training requirement did implicate the Second Amendment's protections at *Bruen*'s first step, Corbett's claim would

33

plainly fail in light of his own concessions. *Bruen* holds that a contemporary firearm regulation that burdens conduct falling within the plain text of the Second Amendment is permissible if there was "historical precedent from before, during, and even after the founding [that] evinces a comparable tradition of regulation." *Bruen*, 142 S. Ct. at 2131-32 (cleaned up). In evaluating potential analogies, courts consider whether the historical and modern requirements "impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified." *Id.* at 2133. The Court stressed that "analogical reasoning requires only that the government identify a well-established and representative historical *analogue*, not a historical *twin*." *Id.* (emphasis in original).

Under that test, Corbett's concession that the State may constitutionally require an applicant for a carry license to satisfy *some* training requirement (*see* JA232) should spell the end of his challenge. The difference between a training requirement that can be satisfied in a day and one that can be satisfied in a weekend simply does not register in a facial challenge under *Bruen*. Corbett's argument about relatively

34

modest differences in burden reduces to an insistence on a "historical twin"—which *Bruen* expressly says is not required.

Third, even if Corbett's concessions are ignored, there is a longstanding historical tradition, similar to the CCIA's training requirement, of limiting the carrying of firearms to law-abiding, responsible individuals and compelling training to ensure safety and proficiency with firearms. For instance, at the Founding, states routinely disarmed individuals who were not considered loyal and responsible.[13] By Reconstruction, there was a tradition of protecting the right of "all loyal and well-disposed inhabitants to bear arms," while excluding dangerous and incompetent people from bearing arms. *See Bruen*, 142 S. Ct. at 2152 (quoting Cong. Globe, 39th Cong., 1st Sess., at 908-09, which disarmed any "disorderly person, vagrant, or disturber of the peace"). While the particular framing of some of those historical laws may be

---

[13] *See, e.g.*, JA97 (7 William Waller Hening, The Statutes at Large: Being a Collection of All the Laws of Virginia From the First Session of the Legislature, in the Year 1619 (Richmond: Franklin Press, 1809), containing the 1756 "Act for Disarming Papists, And Reputed Papists, Refusing To Take The Oaths To The Government"); JA102-03 (An Act for the executing in the Colony of the *Massachusetts-Bay*, in *New England*, one Resolve of the *American Congress*, dated March 14, 1776); JA109-10 (1776-77 edition of the Laws Enacted in the First Sitting of the First General Assembly of the Commonwealth of Pennsylvania, including "An ACT, obliging the male white inhabitants of this state to give assurances of allegiance to the same…").

discredited today, the core concept of ensuring that only responsible, law-abiding persons carry firearms is evergreen. A through-line thus connects the cited laws to the CCIA's requirement that ensures that people who carry firearms receive training on matters such as firearm safety, responsible storage, gun laws, conflict management, and the basic principles of marksmanship.

States also imposed far more time-consuming burdens, such as in mandatory militia training requirements. For instance, New York's 1780 law regulating the state militia required all able-bodied adult men to participate in compulsory training for four days, every single year "to be well and sufficiently exercised trained and disciplined for their instruction and improvement" (JA115). Virginia's 1785 militia law required training even more frequently: every two months. *United States v. Miller*, 307 U.S. 174, 181 (1939) (quoting General Assembly of Virginia, October, 1785, (12 Hening's Statutes)); *see also* SDNY Case No. 22-cv-5867, Dkt. No. 14-11, Federal Militia Act, Second Congress, Sess. I, Ch. 33 (1792), requiring all "free able-bodied white male citizens" between the ages of 18 and 45 to enroll in the militia, and supply, among other things, a "good" musket, firelock, or rifle, and at least 20 balls or 24

cartridges of ammunition, and "to appear, so armed, accoutred and provided, when called out to exercise"). These laws demonstrate a historical tradition, dating back to the Founding era, of requiring time-consuming training to ensure competence with arms.

Corbett devotes most of his brief to advancing three arguments for why militia-training requirements are not relevant evidence of a historical tradition (App. Br. 10-13). These arguments all boil down to an insistence on "a historical twin," contrary to *Bruen*'s admonishment to engage in more flexible, analogical reasoning, *Bruen*, 142 S. Ct. at 2133 (cleaned up). Thus, that militia laws did not apply to persons with disabilities, women, or certain others (App. Br. 11-12) does not make them any less probative of whether the historical public understanding of the Second Amendment right encompassed training requirements. Simply put, a modern regulation need not be a "dead ringer for historical precursors [to] be analogous enough to pass constitutional muster." *Bruen*, 142 S. Ct. at 2133.[14] Nor does the fact that the record does not

---

[14] The Second Amendment also does not carry forward outdated inequities that society has since attempted to remedy. *See* Women's Armed Services Integration Act of 1948, Pub. L. No. 80-625, 62 Stat. 368 (1948); U.S. Const. amend. XIV; *McDonald*, 561 U.S. at 770-78 (explaining that the ratification of the Fourteenth Amendment

*(cont'd on next page)*

include an hour-by-hour agenda for 18th-century militia training days (App. Br. 12) cast any doubt on the relevance of the militia laws. *Bruen* does not require the Court to compare training curriculums, but only burden and purpose. Finally, contrary to Corbett's assertion that militia training is different because it taught "how to kill people," while the CCIA training teaches how to "prevent gun deaths" (*id*. at 12-13), both historical militia training and modern firearm-safety courses with live-fire instruction develop the essential skills of handling firearms properly and using them effectively.

Each of Corbett's arguments falters because the militia laws in the record reveal a historical tradition consistent with the Second Amendment of expecting firearms users to expend time and money to ensure they can use their weapons responsibly and effectively. *See Heller*¸ 554 U.S. at 617-18 (explaining that "learning to handle and use [firearms] in a way that makes those who keep them ready for their efficient use" would "enable[] government to have a well-regulated militia" (quoting Thomas Cooley, *General Principles of Constitutional Law* 271)).

_____

expanded fundamental liberties including the right to bear arms to all citizens, without regard to race).

**B. The remaining preliminary injunction factors weigh against an injunction.**

The district court did not reach either the question of whether the preliminary injunction Corbett sought was necessary to avert irreparable harm during the pendency of the case, or whether the public interest weighs in favor of granting the injunction, because Corbett's claim lacks any likelihood of success on the merits. *We the Patriots*, 17 F.4th at 279-80. But Corbett failed to satisfy either of these prongs of the preliminary-injunction standard, for at least five reasons.

*First*, the preliminary injunction Corbett seeks is not likely to avert any immediate harm because his license application remains incomplete on points that are unrelated to the training requirement. Plaintiffs seeking preliminary relief must "demonstrate that irreparable injury is *likely* in the absence of an injunction, … before a decision on the merits can be rendered," not just a "possibility." *Winter v. NRDC, Inc.*, 555 U.S. 7, 22 (2008) (cleaned up). To immediately protect his Second Amendment rights, he asks the Court to enjoin the requirement that applicants complete an 18-hour training course or supply proof to the licensing officer of training completed since September 1, 2017 that might be considered as a substitute. But even if it did so, this would not result in

the immediate issuance of a concealed-carry permit to Corbett because his application—as of the date of the filing of this brief—remains incomplete in other respects too.

*Second*, there is a disconnect between the preliminary injunction that Corbett seeks and the alleged harm he claims. *See City of N.Y. v. Mickalis Pawn Shop, LLC*, 645 F.3d 114, 144 (2d Cir. 2011) (injunctive relief must be tailored to the specific legal violations). Corbett "do[es]n't dispute that a training requirement of some kind is Constitutional" (JA232), but he nonetheless asks the court to direct the licensing officers statewide "to cease enforcement of these provisions and to continue processing applications for gun licenses as if these sections were not present, until further order of the Court" (JA29). In effect, he asks the courts to issue an overbroad injunction relieving all applicants for concealed-carry licenses of having to show any training at all, on the theory that the 18-hour training requirement is some unspecified number of hours too many. The injunction sought would therefore impose an unnecessary restriction on undisputedly lawful aspects of the regulation. *Waldman Publ'g Corp. v. Landoll, Inc.*, 43 F.3d 775, 785 (2d Cir. 1994).

*Third*, such an injunction would not serve the public interest, because any preliminary injunction of the CCIA, enacted by representatives chosen by the people of New York, would cause a "form of irreparable injury." *Maryland v. King*, 567 U.S. 1301, 133 S. Ct. 1, 3 (2012) (Roberts, J., in chambers) ("[A]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury" (cleaned up)); *Strange v. Searcy*, 574 U.S. 1145, 1145 (2015) (Thomas, J., dissenting) ("The equities and public interest … generally weigh in favor of enforcing duly enacted state laws." (cleaned up)).

*Fourth*, a preliminary injunction of the CCIA's training requirement would cause real-world harm to the public. *See King*, 133 S, Ct. at 3 (staying injunction pending appeal because, among other things, it causes "an ongoing and concrete harm to Maryland's law enforcement and public safety interests"). The CCIA's training requirement, like the dozens of others across the country, is intended to ensure that only competent individuals carry firearms because untrained persons who do not know how to safely use and secure their firearms pose a grave risk to themselves and those around them. A preliminary injunction would

dispense with an important public safety provision that aims to ensure that only responsible, competent individuals publicly carry firearms, potentially leading to the very accidents and deaths that the law is crafted to avoid.

*Fifth*, and finally, the preliminary injunction that Corbett seeks would cause significant disruption and confusion across the State. An injunction—particularly the overbroad one that Corbett seeks—would cause immediate confusion among licensing officials, applicants, and training providers in the early days of implementing a new licensing regime, in a regulatory space that has already undergone significant upheaval. This would lead to uncertainty and delays for applicants and require licensing officials to expend resources to pivot to a new set of protocols.

And, if Corbett does not ultimately prevail on the merits—which is likely (*see supra* Point I & II.A)—the Licensing Division and other licensing officers across the state would have to roll back their new protocols and reexamine permit approvals issued during the litigation's pendency, further compounding these costs. The public interest tips decidedly against the preliminary injunction that Corbett seeks.

42

## CONCLUSION

This Court should affirm the denial of Corbett's motion for a preliminary injunction.

Dated:  New York, NY
        June 13, 2023

Respectfully submitted,

HON. SYLVIA O. HINDS-RADIX
*Corporation Counsel*
*of the City of New York*
Attorney for City Appellees

By:  ELINA DRUKER
     Assistant Corporation Counsel

100 Church Street
New York, NY 10007
212-356-2609
edruker@law.nyc.gov

RICHARD DEARING
CLAUDE S. PLATTON
ELINA DRUKER
   *of Counsel*

43

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief was prepared using Microsoft Word, and according to that software, it contains 8,400 words, not including the table of contents, table of authorities, this certificate, and the cover.

_____
ELINA DRUKER