# 22-3210

# United States Court Of Appeals for the Second Circuit

―――――――――――――――――――――

JONATHAN CORBETT,
*Plaintiff-Appellant*

v.

KATHLEEN HOCHUL, *IN HER OFFICIAL CAPACITY AS CHIEF EXECUTIVE OF THE STATE OF NEW YORK*, LETITIA JAMES, *IN HER OFFICIAL CAPACITY AS ATTORNEY GENERAL OF THE STATE OF NEW YORK,* ERIC ADAMS, *IN HIS OFFICIAL CAPACITY AS MAYOR OF THE CITY OF NEW YORK*, KEECHANT SEWELL, *IN HER OFFICIAL CAPACITY AS POLICE COMMISSIONER OF THE NEW YORK POLICE DEPARTMENT*, INSPECTOR HUGH BOGLE, *IN HIS OFFICIAL CAPACITY AS COMMANDING OFFICER OF THE NEW YORK POLICE DEPARTMENT, LICENSING DIVISION*, AND KEVIN BRUEN, *IN HIS OFFICIAL CAPACITY AS SUPERINTENDENT OF THE NEW YORK STATE POLICE*
*Appellees-Appellees*

―――――――――――――――――――――

On Appeal from the United States District Court for the
Southern District of New York (Hon. Lorna G. Schofield)

―――――――――――――――――――――

**REPLY BRIEF OF PLAINTIFF-APPELLANT JONATHAN CORBETT**

―――――――――――――――――――――

JONATHAN CORBETT, ESQ.
**CORBETT RIGHTS, P.C.**
5551 Hollywood Blvd., Suite 1248
Los Angeles, CA 90028
Phone: (310) 684-3870
FAX: (310) 675-7080
E-mail: jon@corbettrights.com
*Attorney Proceeding* Pro Se

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ........................................................................................3

INTRODUCTION ......................................................................................................4

ARGUMENT ..............................................................................................................5

   I.   CCIA Obviously Regulates Second Amendment-Protected Conduct ................5

   II.  The Government Has Failed to Demonstrate a Historical Analog ......................7

   III.  If the Court Wishes to Balance the Remaining Factors, They Favor Granting an Injunction ......................................................................................................10

   IV.  State Officials Are Proper Appellees .............................................................12

   V.   The City's Argument Against Futility is Frivolous ........................................13

CONCLUSION .........................................................................................................15

RULE 27(d)(2) CERTIFICATE ................................................................................16

CERTIFICATE OF SERVICE .................................................................................17

# **TABLE OF AUTHORITIES**

**Cases**

*District of Columbia et al. v. Heller*, 554 U.S. 570 (2008) ...................................5, 6

*Mitchell v. Cuomo*, 748 F.2d 804 (2nd Cir. 1984) ......................................................11

*N.Y.S.P.R.A. v. Bruen*, 142 S. Ct. 2111 (2022)................................................. *passim*

*We The Patriots U.S., Inc. v. Hochul*, 17 F.4th 266 (2nd Cir. 2021)........................11

**Statutes**

400.00(1)(19) ...............................................................................................................14

## **INTRODUCTION**

Apples and oranges may not be twins, but they are analogous because they both grow on trees.  It is true that only one may be used for pie and only the other may be used for its zest, but they are both still fruit.  It is true that they grow in different climates, but they both require water and sunlight to grow.  And it is true that only one is a significant source of Vitamin C, but both have at least a little of the vitamin, so what's the difference?

Using such perfunctory reasoning, the City and State Appellees continue to insist that an eighteenth century militia membership requirement that did not apply to more than half of the state's population, that was not a prerequisite to gun ownership and did not carry a penalty of disenfranchisement, that did not teach the core topic covered by CCIA's training requirement, and that was not implemented for a remotely similar purpose, is a "historical analog" of the most onerous pre-license training scheme in the country.

"Like all analogical reasoning, determining whether a historical regulation is a proper analogue for a distinctly modern firearm regulation requires a determination of whether the two regulations are 'relevantly similar.'" *N.Y.S.P.R.A. v. Bruen*, 142 S. Ct. 2111, 2132 (2022).  In the context of pie baking, apples are not analogous to oranges, and in the context of the nation's history of regulating firearms, militia membership in not analogous to gun licensing.

Frankly, apples have more in common with oranges than militia membership does with the unconstitutional training program mandated by CCIA. New York officials may not like the Supreme Court's mandate in *Bruen*, but just as Appellant is required to comply with state law, these officials are required to comply with *Bruen* and the U.S. Constitution. Their attempts to circumvent the law by pretending that two completely different historical happenings are the same when they are not must be rejected.

## ARGUMENT

### I. CCIA Obviously Regulates Second Amendment-Protected Conduct

Both the State and City Appellees argue that the Second Amendment may not have any relevance to Appellant's challenge. According to the State Appellees, "Corbett has not met his initial burden under *Bruen* to demonstrate that the Second Amendment's text protects his desired conduct of carrying firearms in public without any training. The Second Amendment protects only a right to bear arms with proper training, as the Supreme Court recognized in *Heller*." State Brief, p. 23[1]. According to the City Appellees, "These measures have no Second

---

[1] All page number references to ECF-stamped header numbers, not litigant-provided footer numbers.

- 5 -

Amendment valence of their own, where they do not prevent law-abiding, responsible persons from carrying firearms." City Brief, p. 41.

This is nonsense. The Second Amendment becomes animated when the government imposes *any* burden on the right of the people to keep or bear arms. The text of the Amendment neither says nor implies any limitation of scope along the lines of "only with proper training" or "only for responsible persons," and neither does *Heller* or *Bruen*. Case law dictates, of course, that the Second Amendment may not be *offended* by reasonable training requirements, but the idea that the Second Amendment is not *implicated* by the same is absurd[2].

The argument of the government is essentially this: the Second Amendment covers keeping and bearing arms, but it doesn't say anything about keeping and bearing arms *without training*. But, following that logic, it also doesn't say anything about keeping and bearing arms *that are semi-automatic*, it doesn't say anything about keeping and bearing arms *away from one's own property*, it doesn't say anything about keeping and bearing arms *that are loaded*, *etc*. These awkward

---

[2] The City Appellants seem further confused. While conceding, "[t]o be sure, *Bruen* leaves a path open for challenging such licensing steps," City Brief, p. 39, they also suggest that Appellant may only challenge training requirements as a general proposition, rather than the specific implementation of their particular training scheme. City Brief, p. 42 ("Corbett's concession that the State may constitutionally require an applicant for a carry license to satisfy some training requirement (see JA232) should spell the end of his challenge."). To the extent that the City Appellants are suggesting that if the Second Amendment allows training to be required, it places no limits on that training, Appellant disagrees.

attempts to chip away at a broad-but-clear principle by pretending the principle does not cover a more specific situation are reminiscent of government officers' wild takes on qualified immunity in cases across the country, *e.g.*, "it was clearly established law that you can't beat non-resisting prisoners, but it wasn't clearly established that you can't beat them *with a baton*." Obviously, this logic would swallow the entire principle, and in this case, the entire Second Amendment.

## II. The Government Has Failed to Demonstrate a Historical Analog

Appellant has argued that militia membership and CCIA requirements are not analogous for the following reasons: 1) the militia membership requirement was unconnected to gun ownership, 2) more than half of the people would have been exempt from the militia requirement but still eligible to buy and carry guns, 3) the core of CCIA's training requirement is a different curriculum, and for a different purpose, than any training one would receive while fulfilling their militia duties. Appellant's Brief, pp. 11 – 13.

As to the first and second, the government concedes that the militia requirements did not apply to most, <u>see</u> State Brief, p. 31, and that the ability to own a gun did not depend on militia membership, and responds, in sum, "So what?" Because "able adult males would have constituted the vast majority of

those exercising a Second Amendment right to bear arms," State Brief, p. 35, the government simply chose not to bother regulating the few women, disabled, or otherwise militia-exempt people who might buy a gun[3]. The "so what" here is that it becomes obvious that the militia requirement was entirely unconnected to any interest in safe gun ownership, because if the government felt that gun training was necessary to protect the people, it would not have exempted large segments of society even if they owned guns at a lesser rate than others.

As to the third, the government not only concedes the same, but proves Appellant's point. According to State Appellees, "during the Founding era, States facing 'external invasions, and internal commotions and insurrections' were acutely concerned with safely training and managing an armed militia. (J.A. 113.) By contrast, today, States are reasonably concerned with addressing a society-wide gun violence epidemic." State Brief, pp. 35, 36.

Justifying how a law aimed at providing for the national defense could possibly be an "analog" of a law aimed at gun crime requires making things up. For example, the State Appellees argue that "[a]lthough the Founding-era and the CCIA training requirements did not have precisely the same content and goals, the

---

[3] The government – both here and in the court below – offers no support for its proposition that non-militia members owned guns at a lesser frequency than militia members, let alone that the incidence of non-militia gun ownership was so minimal as to be insignificant and unworthy of regulation.

basic purpose of each was the same: to ensure that those using firearms did so safely and effectively." State Brief, p. 24. The City Defendants try the same. City Brief, p. 46 ("both historical militia training and modern firearm-safety courses with live-fire instruction develop the essential skills of handling firearms properly and using them effectively."). But neither in this Court nor in the court below was **any evidence** provided that militia gun training included any substantial training about using firearms "safely." *See also* State Brief, p. 34 (asserting with no evidence, "both require individuals bearing arms to complete training with the aim of ensuring that those possessing firearms are familiar with firearm use and do not 'pose a danger to themselves or others.'"). Are we really to believe this 1700s militia training included safe gun storage tips, conflict de-escalation, and suicide prevention? *See* Appellant's Brief, p. 13 (quoting CCIA's curriculum). Likewise, other than two hours of target practice (which arguably touches both safety and efficacy), CCIA does not concern itself with using firearms "effectively:" selection of firearms and ammunition for a particular purpose, how to most effectively use a handgun to stop an attempted robbery, hunting techniques, or even something as basic as "what part of the body should you aim at?" are omitted from CCIA's curriculum. *Id*.

To be clear, Appellant is not arguing that there must be a one-to-one fit between the curricula of the militia and of CCIA in order to be considered a

historical analog. But these programs are overwhelmingly different. Given that they target different groups of people, with different focuses, for a different purpose, the only true similarity is that guns are involved. The government has analogized apples to oranges.

### III. If the Court Wishes to Balance the Remaining Factors, They Favor Granting an Injunction

The court below did not weigh factors beyond "likelihood of success," finding lack of the same to be dispositive. City Brief, p. 47. Thus, the Court could reverse as to likelihood of success and remand for consideration of the remaining factors in the first instance. In the event that the Court would prefer to decide the remaining factors without the assistance of the district court, Appellant discusses them here[4].

As to *irreparable harm*, Appellant's continued loss of his constitutional rights satisfies this factor. See Motion for Prelim. Inj., JA-015, *citing We The*

---

[4] According to the State Appellees, "Corbett makes no argument about the remaining preliminary-injunction factors—irreparable harm, the balance of equities, and the public interest—and has thus forfeited any such argument." State Brief, p. 43. But the district court did not rule on these factors, so Appellant had nothing to argue with. State Appellees fail to recognize that they are asking the Court to affirm *on other grounds*, and Appellant has the right to respond to that in a reply brief in the first instance.

*Patriots U.S., Inc. v. Hochul*, 17 F.4th 266, 294 (2nd Cir. 2021) ("a presumption of irreparable injury flows from a violation of constitutional rights," *internal citation omitted*); *Mitchell v. Cuomo*, 748 F.2d 804, 806 (2nd Cir. 1984) ("When an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary," *internal quotation marks omitted*). State Appellees do not seriously contest this, and devote but a sentence to an argument that Appellant's failure to seek expedited review demonstrates lack of irreparable harm. State Brief, p. 46. This argument conflates irreparability of harm with gravity or urgency of harm. City Appellees do no better, and expressly conflate irreparability with immanency[5]. City Brief, p. 47.

As to *injury to Appellees and the public interest*, both City and State Appellees speak to the gun violence that, they say, will surely ensue if the CCIA's training requirements are struck down. State Brief, pp. 43, 44; City Brief, pp. 49, 50. But before last year, New York had *no training requirement whatsoever*. Not only does this fact destroy their argument that Appellant seeks to change the "status quo," see State Brief, p. 45, because it was Appellees who changed the status quo with CCIA, it removes all footing from an argument that terrible

---

[5] That there may be other barriers standing in the way of Appellant's licensure does not mean that the Court should delay the removal of this barrier. Notwithstanding, the other "barriers" – the social media disclosure requirement and the references requirement – are currently before this Court in other cases and may soon be eliminated.

carnage will result since this state has survived for hundreds of years without a training requirements – as have many other states.

It is true that licensing officials will have to deal with the Court's mandate. City Brief, p. 50. But that is true any time the law changes, and is the direct result of Appellees passing and enforcing a law they knew or should have known was unconstitutional. City Appellees' further concern of "uncertainty and delays for applicants" reads as satire. *Id*.

## IV. State Officials Are Proper Appellees

State Appellees assert that they are all improper defendants because enforcement of CCIA is left to local licensing officials. State Brief, pp. 39 – 42. This argument, even if successful, is of no value for the purpose of this appeal: as long as one proper party is named, the Court can enjoin the application of CCIA.

Notwithstanding, the training requirement is directly traceable to the State Defendants. They concede that "the Superintendent of the State Police must approve the curriculum of firearm safety courses that provide the statutorily

required training." State Brief, p. 41. Their argument that this matters not[6] because Corbett "does not claim any injury from the content of a training curriculum prescribed by the Superintendent," *id*., misses the mark because the question is whether or not the state official is responsible for the enforcement of the law, and he is. *N.Y.S.P.R.A. v. Bruen*, 142 S. Ct. 2111, 2125 (2022) ("the superintendent of the New York State Police, who oversees the enforcement of the State's licensing laws"). Likewise, State Defendants Gov. Kathleen Hochul and Attorney General Letitia James are responsible for aspects of the law traceable to Appellant's injury: Hochul for the law's creation and James for enforcement actions against those who break the law. *See* Complaint, ¶¶ 3 (JA-003), 56 (JA-009).

## V. The City's Argument Against Futility is Frivolous

City Appellees spend 8 pages developing an argument that Appellant does not have standing because his license application has not yet been denied. City Brief, pp. 23 – 31. City Appellees concede that if applying would be futile, then denial is not required for standing purposes. *Id*., p. 24. They argue, however, that

---

[6] It is also undercut by the City Appellee's argument, *infra*, that perhaps an application would not be futile because there may discretion to approve it. If such discretion did exist, it would lie first and foremost with Superintendent Bruen.

it is "speculation" that Appellant's application will be denied, and thus the application is not futile. *Id*., p. 23.

This argument is frivolous and dishonest. Any licensing official reviewing Appellant's application is required by state law to deny it. NY Penal Law 400.00(1)(19) states "an applicant ***shall complete*** an in-person live firearms safety course conducted by a duly authorized instructor with curriculum approved by the division of criminal justice services and the superintendent of state police, and meeting the following requirements: (a) a minimum of sixteen hours of in-person live curriculum…" (*emphasis added*). City Appellees speculate that perhaps Appellant can convince the licensing official that he has "relevant experience from the five years preceding the CCIA's effective date." City Brief, p. 26. But Appellant has no such experience: he has received no training within the 5 years preceding CCIA's effective date, and has never, in total completed "sixteen hours of in-person live curriculum[7]." His pending application, therefore, must be denied, and waiting for that denial is an exercise in futility.

---

[7] City Appellees attempt to suggest that because, in the court below, Appellant submitted an affidavit as to not receiving training in the five years before the motion (October 28th, 2017 – October 27th, 2022), this is non-dispositive because the relevant time window is five years before CCIA's effective date (September 1st, 2017 – August 31st, 2022. City Brief, p. 29. The difference in these time windows is less than two months; the overlap is approximately 97%. In other words, the City Appellees suggest that, perhaps, during September 1st, 2017 and October 27th, 2017, Appellant may have taken 16 hours of live in-person gun training that would

## **CONCLUSION**

Appellees would have it that "[t]hose who have refused to complete training on the safe use of firearms are not among the responsible citizens to whom the Second Amendment gives a right to bear such arms." State Brief, p. 28. Appellant would counter that government officials who purposely interfere with the constitutional rights of the people by passing bad faith laws designed solely to make exercise of those rights more difficult are not the responsible officials that We the People deserve. The Court here is not asked to strike a reasonable gun safety regulation, but rather to strike an attempt at circumventing the Constitution and the clear mandate of the U.S. Supreme Court.

Dated: New York, New York
      July 5th, 2023

Respectfully submitted,

Jonathan Corbett, Esq.
**CORBETT RIGHTS, P.C.**
*Attorney Proceeding* Pro Se
5551 Hollywood Blvd., Suite 1248
Los Angeles, CA 90028
Phone: (310) 684-3870
FAX: (310) 675-7080
E-mail: jon@corbettrights.com

---

satisfy a licensing officer that CCIA's requirements have been met. This is silliness.

## **RULE 27(d)(2) CERTIFICATE**

This brief complies with L.R. 27.1(a)(3) and Fed. R. App. P. Rule 27(d)(2) because it contains approximately 3,100 words.

Dated: New York, New York

    July 5th, 2023

Respectfully submitted,

_____

Jonathan Corbett, Esq.
**CORBETT RIGHTS, P.C.**
*Attorney Proceeding* Pro Se
5551 Hollywood Blvd., Suite 1248
Los Angeles, CA 90028
Phone: (310) 684-3870
FAX: (310) 675-7080
E-mail: jon@corbettrights.com

## **CERTIFICATE OF SERVICE**

I certify that this document was served on all appellees via the CM/ECF system on July 5th, 2023.

Dated: New York, New York　　　　　Respectfully submitted,

　　July 5th, 2023

　　　　　　　　　　　　　　　　　　_____
　　　　　　　　　　　　　　　　　　Jonathan Corbett, Esq.
　　　　　　　　　　　　　　　　　　**CORBETT RIGHTS, P.C.**
　　　　　　　　　　　　　　　　　　*Attorney Proceeding* Pro Se
　　　　　　　　　　　　　　　　　　5551 Hollywood Blvd., Suite 1248
　　　　　　　　　　　　　　　　　　Los Angeles, CA 90028
　　　　　　　　　　　　　　　　　　Phone: (310) 684-3870
　　　　　　　　　　　　　　　　　　FAX: (310) 675-7080
　　　　　　　　　　　　　　　　　　E-mail: jon@corbettrights.com