

MURIEL GOODE-TRUFANT
*Corporation Counsel*

THE CITY OF NEW YORK
LAW DEPARTMENT
100 CHURCH STREET
NEW YORK, NEW YORK 10007

ELINA DRUKER
*Assistant Corporation Counsel*
Phone: 212-356-2609
edruker@law.nyc.gov

October 14, 2025

Clerk of the Court
U.S. Court of Appeals for the Second Circuit
40 Foley Square
New York, New York 10007

Re: *Corbett v. Hochul*
Docket No. 22-3210

Dear Ms. Wolfe:

I write on behalf of City appellees, as directed by this Court's August 20, 2024 order (ECF No. 92), to address the effect of *Giambalvo v. Suffolk County*, No. 23-208 (2d Cir. Sept. 12, 2025), and *United States v. Rahimi*, 602 U.S. 680 (2024), on the issues in this appeal. Plaintiff Jonathan Corbett appeals from the order of the U.S. District Court for the Southern District of New York (Schofield, J.) denying his motion for a preliminary injunction against enforcement of New York State's firearms-training requirement for issuance of a concealed-carry license. *Giambalvo* and *Rahimi* strongly support affirmance because they confirm that the training requirement likely satisfies Second Amendment scrutiny.

As explained in the City's principal brief, the Supreme Court has recognized that training requirements for licensure are consistent with the Nation's historical tradition of firearm regulation. *Giambalvo* addressed the same New York training requirement and, relying on the same precedent the City invoked here, held that the requirement is presumptively constitutional. Corbett has identified no basis to rebut that presumption and therefore has not shown that he is likely to succeed on the merits.

Although there is no need to go further to affirm, the City and the State also showed that the training requirement is consistent with historical laws that sought to limit firearm access to individuals able to use them safely and required proficiency in firearm use. *Rahimi* and *Giambalvo* outlined the proper methodological approach to historical analysis, which calls for flexible analogical reasoning, and this form of reasoning supports the constitutionality of the training requirement. The decisions clarify that the history-and-tradition test does not "suggest a law trapped in amber," and that a contemporary regulation is constitutional if it is "consistent with the principles that underpin our regulatory tradition." *Rahimi*, 602 U.S. at 691-92. As the City showed, the same principles that animated the cited historical gun regulations also underpin the challenged training requirement. The Court may alternatively affirm on this ground.

# RELEVANT BACKGROUND

## A. Procedural background of Corbett's lawsuit challenging the training prerequisite for obtaining a concealed carry license in New York State

Plaintiff-appellant Jonathan Corbett appeals from the district court's denial of his motion for preliminary injunction barring enforcement of New York State's requirement that new concealed-carry license applicants complete a firearms-training program as a precondition of licensing. The State adopted the training requirement in 2022, after the Supreme Court invalidated the State's previous concealed-carry licensing scheme and announced a new methodological approach for Second Amendment challenges. *N.Y. State Rifle & Pistol Assn. v. Bruen*, 597 U.S. 1 (2022); Concealed Carry Improvement Act ("CCIA"), L. 2022, ch. 371, § 4. Among other things, the CCIA requires all new applicants for a concealed-carry license to complete 18 hours of training, consisting of 16 hours of "in-person live curriculum" and 2 hours of "live-fire range training." New York Penal Law § 400.00(19).

Corbett brought this lawsuit against City and State defendants to challenge various aspects of the CCIA, including the training requirement. While his application for a license to carry a concealed firearm was still incomplete and pending before the NYPD's License Division, he filed a motion for a preliminary injunction against enforcement of the training requirement (Joint Appendix ("JA") 5, 236-37). The district court denied his motion after

"assum[ing] without deciding that he is likely to be able to show that has standing" (JA237-38). As for the merits, the district court held that Corbett had failed to demonstrate a likelihood of success on the merits (JA235-41; *see also* SDNY Case No. 22-cv-5867, ECF No. 74). The court reasoned that, while "the Second Amendment's plain text covers the conduct in question … the training requirement is consistent with the Nation's historical tradition of firearm regulation" (JA239). The court found that militia laws from the Founding-era imposed requirements analogous to the CCIA's training requirement and were at least as burdensome (JA239-40).

In November 2023, this Court issued a summary order remanding with direction that the district court make the threshold standing determination (2d Cir. Case No. 22-3210, Dkt No. 79-1). While the case was back before the district court, the NYPD Licensing Division completed processing Corbett's application, denying him a license in May 2024 due to his failure to show that he had satisfied the training requirement. Following this development, the district court determined that Corbett has standing to challenge the training requirement based on the denial of his application for failure to satisfy it (SDNY Case No. 22-cv-05867, Dkt. No. 99). The court also dismissed all

4

claims against the State Defendants.[1] Following that decision, Corbett reinstated his appeal, and the merits of the district court's previous denial of a preliminary injunction against the CCIA's training requirement is now before this Court.

In the meantime, in September 2023, this Court heard oral argument in *Giambalvo v. Suffolk County*, No. 23-208, another challenge to the CCIA's training requirement. In August 2024, this Court directed that this appeal be held in abeyance until *Giambalvo* was decided and directed the parties to submit letter briefs within 30 days of the issuance of the *Giambalvo* decision addressing both *Rahimi* and *Giambalvo* (2d Cir. Case No 22-3210, Dkt. No. 92 ("Op.")). This Court issued its decision in *Giambalvo* on September 16, 2025.

### B. The Supreme Court's decision in *United States v. Rahimi*

In *Rahimi*, in an 8-to-1 opinion by Chief Justice Roberts, the Supreme Court upheld 18 U.S.C. § 922(g)(8), a federal law that bars anyone subject to a domestic-violence restraining order from possessing a gun. 602 U.S. at 698. Rahimi argued that his indictment under § 922(g)(8) for violating a civil domestic-violence-related protection order violated his Second Amendment

---

[1] The district court also directed the Clerk to amend the caption, removing former NYPD Commissioner Keechant Sewell and substituting in her place Edward A. Caban. In November 2024, Edward A. Caban was replaced by Jessica S. Tisch.

5

rights because the government could not identify similar laws disarming civilly adjudicated domestic abusers from the Founding-era. *Id.* at 689. The Fifth Circuit agreed. *Id.*

The Supreme Court rejected this argument, and, in so doing, provided guidance on how Second Amendment challenges should be analyzed in the future. Applying a flexible analogical approach, the Court held that, "[t]aken together, the surety and going armed laws [that the government had proffered] confirm what common sense suggests: When an individual poses a clear threat of physical violence to another, the threatening individual may be disarmed." *Id.* at 698.

### C. This Court's decision in *Giambalvo v. Suffolk County*

In *Giambalvo*, plaintiffs brought a facial Second Amendment challenge to several of the CCIA's licensing requirements and to how the Suffolk County Police Department was processing applications and enforcing the CCIA. Op. at 4-5. With respect to the application requirements, they challenged the law's character requirement, in-person interview requirement, disclosure requirements relating to household members and social-media accounts, and the firearms training requirement at issue here. N.Y. Penal Law § 400.00(1). The district court denied the plaintiffs' motion for a preliminary injunction, and this Court affirmed.

After summarizing recent Circuit precedent fleshing out how the Second Amendment's history-and-tradition inquiry should be applied in facial challenges, Op. at 16-17, 19-23, this Court held that the plaintiffs were unlikely to succeed in their challenge to the training requirement, Op. at 34. The Court concluded that the training requirement was "part of [a] presumptively constitutional shall-issue licensing regime[]," and that plaintiffs had failed to rebut that presumption. Op. at 30-32. The Court also found that the plaintiffs were unlikely to succeed on any of their other theories, except their social-media challenge, which was moot because that provision was enjoined as a result of a separate lawsuit, and their challenge to the county's arrest policy, which needed further record development. Op. at 27-30, 37-39.

**ARGUMENT**

**A.** ***Giambalvo*** **confirms that the CCIA's training requirement is presumptively lawful.**

**1. Training requirements that are part of shall-issue licensing regimes are presumptively lawful.**

In *Giambalvo*, this Court rejected a similar challenge to Corbett's to the CCIA's 18-hour firearms-training requirement. Citing *Bruen*, 597 U.S. at 39 n.9, this Court explained that "the Supreme Court has included firearm training requirements as part of presumptively constitutional shall-issue licensing regimes," and thus, "plaintiffs seeking to preliminarily enjoin the enforcement of a firearms training requirement must make at least some

7

showing to overcome this presumptive constitutionality as part of their burden of establishing []a clear or substantial likelihood of success on the merits." *Giambalvo*, Op. at 30-34.

*Giambalvo*'s holding—which applies the clear language of *Bruen*—supports the arguments in the City's principal brief (*see* City Appellees' Br. 25-26). As we explained, "*Bruen* answers the question posed by this case" (*id.* at 25). The Supreme Court in *Bruen* held that, to be valid under the Second Amendment, a restriction on the right to carry a concealed firearm must be "consistent with this Nation's historical tradition of firearm regulation." 597 U.S. at 34. And it made clear that "nothing in [its] analysis should be interpreted to suggest the unconstitutionality of the 43 States' 'shall-issue' licensing regimes … which often require applicants to undergo a background check or *pass a firearms safety course* … to ensure … that those bearing arms in the jurisdiction are, in fact, 'law-abiding, *responsible* citizens.'" *Id.* at 39 n.9 (emphasis added). Likewise, in his concurrence, Justice Kavanaugh emphasized that *Bruen* did not cast doubt on the lawfulness of "43 States[' choice to] employ objective shall-issue licensing regimes," which "may require a license applicant to undergo fingerprinting, a background check, a mental health records check, and *training in firearms handling and in laws regarding the use of force*, among other possible requirements." *Id.* at 80 (Kavanaugh, J., concurring) (emphasis added).

Across the Nation, many shall-issue regimes that the Court cited as consistent with the Second Amendment feature training requirements comparable to the CCIA's. Indeed, the City principal brief (at 29-31) catalogues dozens of training and testing requirements. As we asserted, the Supreme Court's endorsement of these various training requirements without a detailed review of the laws' many nuances reflects that the "reasonable, well-defined" steps required for licensure designed to ensure that firearms remain in the hands of law-abiding, responsible individuals would not generally trigger Second Amendment scrutiny on their face. *Bruen*, 597 U.S. at 70 (cleaned up). In other words, measures like background checks and training requirements are preemptively valid and not subject to further Second Amendment scrutiny, unless a plaintiff shows they are put to abuse ends. *Giambalvo*, Op. at 32. Since *Giambalvo*, this Court has reiterated this rule in *Frey v. City of N.Y.*, ___F.4th ___, No. 23-365-cv, Slip Op. at *44-45 (2d Cir. Sep. 19, 2025), holding that New York City's special-license requirement for out-of-City residents is presumptively valid.

Applying these principles here, as this Court observed in *Giambalvo*, Op. at 30-32, the CCIA's training requirement—as a regulation comparable to those contained in the shall-issue regimes already approved by the Supreme Court—is presumptively valid. A plaintiff must "persuasively rebut

[its] presumptive validity" to show a likelihood of success on the merits. *Id.* at 32.

### 2. Corbett has failed to show that the CCIA's training requirement is being put the abusive ends in every application.

The *Giambalvo* Court observed that, under *Bruen*, a plaintiff could bring a constitutional challenge to a presumptively valid aspect of a shall-issue licensing regime if the scheme is being "put toward abusive ends," or involves, for example, "lengthy wait times" and "exorbitant fees" that effectively "deny ordinary citizens their right to public carry." *Giambalvo*, Op. at 32 (quoting *Bruen*, 597 U.S. at 38, n.9). During oral argument before the district court, Corbett did not take issue with this standard, stating that he did not "dispute that a training requirement of some kind is Constitutional …; the question is whether or not they're excessive" (JA232).

In concluding that the plaintiffs had failed to show that the CCIA's training requirement was put to abusive ends, the *Giambalvo* panel emphasized that the plaintiffs' burden was substantial because they were advancing a facial challenge. Op. at 33. To succeed on a facial challenge, a plaintiff must "'establish that no set of circumstances exist under which the [challenged provision] would be valid.'" *Id.* (quoting *Rahimi*, 602 U.S. at 693 (alteration in original)). In other words, a facial challenge cannot succeed based on "hypothetical scenarios" where the regulation "might raise constitutional

concerns." *Rahimi*, 602 U.S at 701. Corbett likewise advances only a facial challenge. To succeed, he must show that there is no set of circumstances under which the training requirement could be valid.

The *Giambalvo* plaintiffs attempted to meet their burden by showing that training courses in Nassau and Suffolk Counties are prohibitively expensive, citing evidence that classes cost between $400 and $800. Op. at 33-34. This Court concluded that—even setting aside the problem for the plaintiffs that "those fees are charged by private parties, not the … government"—$400 "is unlikely to be exorbitantly expensive," and anyway, "at least some of the training courses being offered are not so prohibitively expensive" as to prevent individuals from exercising their Second Amendment rights. Op. at 34 (cleaned up). The plaintiffs were therefore "unlikely to prevail under th[is] theory." *Id.* at 33.

Corbett is similarly unlikely to prevail. He has made no effort to meet his burden on a facial challenge to show that, in all circumstances, compliance with the CCIA's training requirement is prohibitively expensive or that the requirement is being put to abusive ends. Indeed, although he suggested below that the requirement was too financially burdensome or caused a delay in the processing of applications (S.D.N.Y. Case No. 22-cv-5867, Dkt. No. 75 (Tr.) at 20-21), he abandoned those contentions on appeal, limiting his arguments to challenging the CCIA's training requirement's historical

11

provenance (*see* App. Br. 10-13). That choice is fatal to his claim because, as *Giambalvo* confirms, the Supreme Court has already recognized that training requirements are presumptively consistent with the Second Amendment.

### B. Although there is no need to delve into history, guidance from *Rahimi* and *Giambalvo* confirms that the CCIA's training requirement is consistent with our Nation's tradition of firearms regulations.

Given the Supreme Court's pronouncements in *Bruen*, the *Giambalvo* Court declined to examine "at this preliminary stage" the government's historical analogues for the training requirement because the requirement is presumptively consistent with the Nation's historical tradition of firearm regulation under *Bruen*. Op. at 32 n.7. The Court may follow suit here and affirm the denial of a preliminary injunction without further examination of historical firearm regulations. In any event, guidance from *Rahimi* and *Giambalvo* confirms that, as explained in the City's principal brief (at 32-38), the CCIA's firearms training requirement is relevantly similar to historical gun regulations.

#### 1. *Rahimi* and *Giambalvo* provide additional guidance about how to apply *Bruen*'s history-and-tradition test

The Supreme Court's decision in *Rahimi*, as well as recent decisions from this Court, including *Giambalvo*, provide additional guidance on how to apply *Bruen*'s history-and-tradition test. *See Rahimi*, 602 U.S. at 700; *Giambalvo*, Op. 20-23; *see also Frey*, Slip Op. at *10-21 (summarizing

Second Amendment methodology); *Antonyuk v. James*, 120 F.4th 941, 963-74 (2d Cir. 2024) ("*Antonyuk II*") (same). That guidance confirms that the City may, consistent with the Second Amendment, deny licenses to people who refuse to complete a training requirement.

In *Rahimi*, the Supreme Court admonished lower courts for taking an overly rigid approach to *Bruen*'s history-and-tradition test. The Court emphasized that *Bruen* had "not meant to suggest a law trapped in amber." 602 U.S. at 691. Instead, courts considering the constitutionality of restrictions on gun rights must determine "whether the new law is 'relevantly similar' to laws that our tradition is understood to permit, applying faithfully the balance struck by the founding generation to modern circumstances." *Id.* at 692 (cleaned up).

The Court emphasized that "some courts have misunderstood the methodology of our recent Second Amendment cases." *Id.* at 691. The challenged law "must comport with the principles underlying the Second Amendment, but it need not be a 'dead ringer' or a 'historical twin.'" *Id.* at 692 (cleaned up). The Court clarified that when assessing whether a modern regulation is "relevantly similar" to historical regulations, courts should focus on the *purpose* of the regulations to determine "whether the challenged regulation is consistent with the *principles* that underpin our regulatory tradition." *Id.* (cleaned up). "Why and how the regulation burdens the right are

central to this inquiry." *Id*. Thus, a similar regulation of the same problems that existed at the Founding "will be a strong indicator that contemporary laws imposing similar restrictions for similar reasons fall within a permissible category of regulations." *Id*. But "when a challenged regulation does not precisely match its historical precursors, it still may be analogous enough to pass constitutional muster." *Id*. at 692. Justice Barrett, in concurrence, likewise emphasized that *Bruen* should not be read to require "overly specific analogues," because it was wrong to assume that Founding-era legislatures maximally exercised their regulatory power, and *Bruen* requires a "wider lens" that looks at the principles inherent in historical laws. *Id*. at 739 (Barrett, J., concurring).

Applying this flexible analogical standard to assess the constitutionality of a firearms ban for people subject to civil protective orders, the Court examined two separate lines of historical regulations: surety laws that gave courts the power to require individuals who were believed to be a threat to post a bond, and criminal "affray" laws that punished individuals who threatened others with guns. Viewing them together, the Court identified an underlying principle, concluding that they "confirm what common sense suggests: When an individual poses a clear threat of violence to another, the threatening individual may be disarmed." *Id*. at 740.

*Giambalvo* embraces this flexible approach and provides additional insights into how courts should approach the history-and-tradition inquiry. *Giambalvo* relied heavily on this Court's lengthy post-*Rahimi* decision in *Antonyuk II*, which "further delineate[s] the proper legal contours of this analytical approach" to the Second Amendment. *Giambalvo*, Op. at 20. Citing *Antonyuk II*, *Giambalvo* explained that even the complete absence of distinctly similar historical laws is not necessarily evidence that a modern law is inconsistent with our national tradition of firearms regulation, and cautioned against making assumptions based on historical silence "because there are many reasons why the historical record may not evidence statutory prohibitions on a given practice, such as the existence of custom, universal practice, or private warning," or "lack of political demand." *Id.* at 20-21 (cleaned up). The Court further explained that, while a one-off or short-lived law may not be evidence of a tradition if it stands against "the overwhelming weight of other evidence," it is not dispositive whether the government can show historical regulations "in significant numbers." *Id.* at 21-22 (cleaned up).

*Giambalvo* also emphasized that in a challenge to a state law, like the CCIA, "the prevailing understanding of the right to bear arms in 1868 and 1791 are both focal points of our analysis." Op. at 22-23 (cleaned up). And the fact that evidence from these two eras may diverge "does not mean that

the right to keep and bear arms was calcified in either 1791 or 1868." *Id.* at 23. Rather, both are "fertile ground, and the adjacent and intervening periods are likewise places in the historical record to seek evidence of our national tradition of firearms regulation." *Id.* at 23.

### 2. *Rahimi* and *Giambalvo* confirm that Corbett's challenge is meritless.

*Rahimi* and *Giambalvo* confirm that the district court correctly denied Corbett's application for a preliminary injunction of the CCIA's training requirement. That requirement is consistent with our national tradition of requiring training as a licensing precondition to ensure that individuals authorized to carry firearms do not pose a safety risk to themselves or others. *See Antonyuk II*, 120 F.4th at 976 (upholding CCIA's character requirement because "[a] reasoned denial of a carry license to a person who, if armed, would pose a danger to themselves, others, or to the public is consistent with the well-recognized historical tradition of preventing dangerous individuals from possessing weapons").

In his principal brief, Corbett argued that the historical laws cited by the City and State, such as militia training laws, are not sufficiently analogous to the training requirement because they were designed for different purposes; historically, in Corbett's telling, lawmakers were "attempting to create a defense force," while the training requirement is designed to further "gun

16

safety issues." (App. Br. 10). But *Giambalvo* cast doubt on an identical argument. Op. 32-33 n.7. The *Giambalvo* plaintiffs argued that historical militia laws requiring mandatory training were not analogous to the CCIA's training requirement because militia laws applied to the general population, did not result in disarmament, and were premised on the assumption that militia members already lawfully had guns. *Id.* Although *Giambalvo* resolved the appeal on different grounds, the court expressing skepticism about the argument, noting that in *Antonyuk II*, applying a flexible analogical approach, the Court had found that "the State's proffered militia laws were 'relevantly similar' to a challenged sensitive location provision." *Id.*

In *Antonyuk II*, this Court upheld the designation of "any location providing health, behavioral health, or chemical dependance care or services," N.Y. Penal Law § 265.01-e(2)(b), as a sensitive place where firearms are prohibited. The Court reasoned that militia law that excluded people with intellectual disabilities, mental illnesses, and alcohol addictions from militia service and historical laws prohibiting firearms in schools "establish[] a tradition of prohibiting firearms in locations where vulnerable populations congregate and a concomitant tradition of considering those with behavioral and substance dependence disorders to constitute a vulnerable population justifying firearm regulation." 120 F.4th at 1010-12. The laws may have looked very different, but the underlying principles were relevantly similar. The fit

between the militia laws and firearm-training requirements is much closer. As *Giambalvo* suggested, this principles-focused mode of analysis effectively forecloses Corbett's attempt to distinguish militia laws that required training from the CCIA's training requirement.

Indeed, as demonstrated by the many laws catalogued in the City's principal brief (at 35-38) and the State's principal brief (at 22-25, 27-28), our Nation has a longstanding tradition of limiting the carrying of firearms to responsible individuals, compelling training to ensure safety and proficiency with firearms, and requiring firearms owners to bear the cost of training. Even before the Founding, states regularly disarmed individuals who were unable to safely carry arms and required time-consuming and costly training to ensure competence with arms by militia members. *See District of Columbia v. Heller*, 554 U.S. 570, 617-18 (2008) (explaining that learning to handle and use firearms "ready for their efficient use" was understood historically to be part of keeping arms).

It is of no moment that there are some differences between, on the one hand, militia laws and historical laws disarming individuals deemed dangerous, and, on the other hand, the modern training requirement; there are also salient similarities as to both purpose and burden that reflect a national tradition of regulation to ensure proficiency with firearms and to disarm incompetent individuals. As to purpose, like the militia training requirements, the

purpose of the CCIA's training requirement is to ensure that all individuals carrying concealed firearms in the state have a minimum level of proficiency with firearms and familiarity with the best practices for lawfully keeping and carrying them. And, like historical laws disarming individuals deemed dangerous or mentally incompetent, the purpose of the CCIA's training requirement is to keep firearms out of the hands of individuals who could not use them safely. And as for burden, compared to militia requirements that required regular practice throughout the year and costly maintenance, the CCIA's requirement to participate in a course that can be done in a single weekend is comparatively, and in fact far less, burdensome.

In all, *Rahimi* and *Giambalvo* set out a flexible analogical approach to the Second Amendment under which Corbett has not and cannot show a likelihood of success on the merits.

# CONCLUSION

The district court correctly denied Corbett's motion for a preliminary injunction, and this Court should affirm for the reasons stated in the City and State Appellees' principal briefs and for the additional reasons stated here.

Respectfully submitted,

MURIEL GOODE-TRUFANT
*Corporation Counsel*
*of the City of New York*
Attorney for City Defendants

By: /s/ Elina Druker
Elina Druker
Assistant Corporation Counsel

cc: *All counsel of record by ECF/ACMS*